[No. A114686. First Dist., Div. Two. May 24, 2007.]

In re DAVID BARKER on Habeas Corpus.

■■■■■■■■■■■■■■■■■■■■

COUNSEL

Marc Elliot Grossman for Petitioner David Barker.

Bill Lockyer, Attorney General, Mary Jo Graves, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Jennifer A. Neill and Denise A. Yates, Deputy Attorneys General, for Respondent State of California.

OPINION

RICHMAN, J.—In 1977, 16-year-old David Barker participated with his friend Barry Braeseke in the killing of Braeseke's parents and grandfather. Braeseke shot his parents and Barker shot the grandfather, after first hitting him several times on the head with a chisel. Tried as an adult, Barker was convicted of two counts of second degree murder and one count of first degree murder. Now almost age 47, Barker has been in state prison for 29 years, during which time he has participated in numerous self-help programs, obtained his General Education Diploma (G.E.D.), earned 45 units of college credit, acquired several vocational skills, and has been discipline-free since 1995. And Barker's development in prison culminated in a September 2005 mental health evaluation that confirmed earlier evaluations: "risk for recidivism on a violent crime while in the free community is within the low range."

Against that background, Barker appeared on November 14, 2005, before a two-person panel of the Board of Parole Hearings (Board),[1] in his ninth attempt to obtain parole. Barker was sworn and answered questions from the Board members and from his counsel. No other witnesses appeared. Following a relatively brief hearing,[2] the Board orally announced its two decisions: it refused Barker parole and deferred his next parole hearing for three years.

■■■■ In this petition for writ of habeas corpus Barker makes five arguments, the first of which is in essence that the Board's denial of parole violated his due process rights because it was based on findings supported by no evidence, based on grounds supported solely on the unchangeable facts of his commitment offenses, and/or based on grounds inherent in the elements

---

[1] "Legislation effective July 2005 substituted the former Board of Prison Terms with the Board of Parole Hearings (Pen. Code, § 5075, subd. (a)), and designated the governing agency, formerly the California Department of Corrections, the California Department of Corrections and Rehabilitation, Division of Adult Operations (id., § 5000)." (In re Elkins (2006) 144 Cal.App.4th 475, 479, fn. 1 [50 Cal.Rptr.3d 503] (Elkins).)

[2] The hearing started at 1:35 p.m. and concluded at 3:30 p.m., including the recess (the length of which is not reported in the record) to deliberate.

and definitions of the commitment offenses. We conclude that this contention has merit, and thus grant the petition and order a new parole suitability hearing.

## BACKGROUND

### 1. *Procedural Background*

Although 16 years old at the time he committed the crimes, Barker was tried as an adult.[3] He was convicted by a jury on April 14, 1977, and received three concurrent sentences—five years to life for each of the second degree murder convictions for the killing of Braeseke's parents, and life for the first degree murder conviction for the killing of Braeseke's grandfather. Barker's minimum parole eligibility date was set at August 25, 1983. The Board has denied Barker parole 10 times: in 1982, 1984, 1986, 1987, 1988, 1991, 1994, 1997,[4] 2000 and, most recently, 2005.[5]

On February 28, 2006, Barker filed a petition for a writ of habeas corpus in Alameda County Superior Court challenging the Board's most recent denial of parole. The superior court denied that petition on July 13, 2006. Barker filed his petition for habeas corpus in this court on July 31, 2006, accompanied by 13 exhibits. On October 4, 2006, we issued an order to show cause directed at the Director of the Department of Corrections and Rehabilitation, pursuant to which respondent John Marshall, warden at the California Men's Colony (Warden), filed a return, accompanied by 22 exhibits of his own.[6] Barker filed a denial and traverse.

### 2. *The Crimes*

The following description of the crimes comes from the Board's initial decision in 1982 denying parole, part of which the Board quoted in its decision at the November 14, 2005 parole hearing (Parole Hearing): In June

---

[3] Barker's case was at first "handled according to standard California Juvenile Court procedure." (*Barker v. Estelle* (9th Cir. 1990) 913 F.2d 1433, 1435.) But at an October 15, 1976 fitness hearing, the juvenile court determined Barker should be tried as an adult " 'based upon the circumstances and gravity of the offense[s] . . . and the degree of criminal sophistication allegedly exhibited by the minor in the offenses charged.' " (*Id.* at pp. 1435–1436.)

[4] In 1997, the Board reviewed and affirmed its 1994 decision denying parole for five years.

[5] In 2003 and again in 2004, the Board granted one-year stipulated postponements (the second one so a new psychological evaluation could be prepared), resulting in a five-year gap between the 2000 and 2005 hearings.

[6] Neither side objects to any of the exhibits offered by the other, and we assume that all were before the Board, who had the "opportunity to review [Barker's] files and record." We consider all these materials as properly before us.

of 1976, Barker and codefendant Braeseke met over citizens' band (CB) radio. Soon after they met, Braeseke asked Barker to help kill Braeseke's parents. The two talked of living and traveling together with the money they would get after the parents were dead.

Barker often boasted to Braeseke he had killed chickens before. Several times, Barker had tied a bag around some chickens' heads and thrown them up in the air to watch them hit the ground. He had also buried a chicken up to its head, then put hay in a circle around the chicken and lit it on fire.[7] Based on these experiences, Barker suggested the best way to kill Braeseke's parents would be by hitting them on the head and choking them.

On August 23, 1976, after Barker and Braeseke had spent the day together, they went to Barker's garage and selected weapons. Barker chose a chisel and Braeseke chose a heavy mug. They then went to Braeseke's house. In Braeseke's bedroom they discussed their plan. The discussion was interrupted when Braeseke was called to dinner. After dinner, Braeseke returned to Barker, who had waited in the bedroom. They went downstairs to the family room where Braeseke's mother, father and grandfather were watching television. After being in the family room a brief period, Barker and Braeseke went back upstairs where Braeseke said he wanted to use his .22 rifle rather than choke his parents and grandfather. The two agreed. Barker then went back downstairs. Braeseke remained in his room for a few more minutes then went downstairs. At approximately 8:00 p.m., Braeseke walked up behind his father and shot him in the head three times. Braeseke then shot his mother two times, once in the head and once in the stomach. Barker struck the grandfather on the head with a chisel three to four times.[8] After shooting his mother and father, Braeseke came over to help Barker by throwing the grandfather on the floor next to the mother. Barker then picked up the .22 rifle and shot the grandfather twice in the head. All these events, Barker said, happened in very quick succession.

Afterwards, Barker and Braeseke ransacked the house to make it look like a burglary. Afraid of leaving fingerprints, Barker and Braeseke removed some of the objects they had touched while ransacking the house, along with the .22 rifle. While driving towards Hayward, they stopped at a gas station to wash blood off of their clothes. They went to a secluded road where Barker

---

[7] At the Parole Hearing Barker admitted he had been "cruel to chickens," but clarified he had not done this while with Braeseke.

[8] Barker told the Board his three or four blows to the grandfather's head with the chisel were not enough to kill him.

threw the .22 rifle under a bridge. Barker hid the objects they had removed from the house in his backyard.[9]

### 3. *Barker's Background*

According to a September 2005 psychological assessment, Barker grew up in a stable family without serious problems. He described his parents as supportive. While his brother was an alcoholic, there was no other family history of alcoholism or drug abuse. There was no domestic violence, no mental disorders, and no legal problems. Barker has maintained contact with his half sister and his mother while in prison. His father and brother are deceased.

Barker's criminal record consists of the commitment offenses and one arrest, in 1973, when Barker was 13 years old. Barker was arrested (along with four other juveniles) for burglary and vandalism of items from an apartment complex storage locker. He received a reprimand and his parents paid for his share of the damage. At the Parole Hearing Barker testified no charges were ever filed. In a separate incident almost two years later, Barker's parents reported him to the sheriff's department when he did not return home on time. This incident did not lead to any arrest.

The April 2004 life prisoner evaluation report indicated that "[n]eighbors described [Barker] as a troublemaker and stated they saw him torture animals and light fire to a neighboring property that resulted in $45,000 worth of

---

[9] This summary of facts from the Board's 1982 decision came from the probation officer's report and Alameda County court transcripts. Much of this summary also appears almost verbatim in an April 2004 life prisoner evaluation report. Our 1979 opinion affirming the judgment against Barker also summarizes the facts of the crimes, which summary is more detailed and differs in many respects from the facts recited at Barker's parole hearings. (*People v. Barker* (1979) 94 Cal.App.3d 321, 324–327 [156 Cal.Rptr. 407].) Most significantly, our opinion provides Barker's trial testimony regarding Braeseke's dominant leadership role in the killings. (See, e.g., *id.* at p. 326 [Barker testified Braeseke instructed him to hit the grandfather with the chisel and Barker "did so only because [Braeseke] 'walked around with the gun pointing at' " him]; see also *People v. Braeseke* (1979) 25 Cal.3d 691 [159 Cal.Rptr. 684, 602 P.2d 384] [the record resulting in the Supreme Court's opinion states Braeseke "urged Barker to kill his grandfather, and when Barker hesitated, [Braeseke] threw his grandfather on top of his mother's body and ordered Barker to hit him"].)

Barker relies on some of the facts recited in our 1979 opinion in his habeas corpus petition and supporting papers. It is unclear whether the Board ever reviewed trial transcripts or our opinion in reaching its decisions denying parole, and the transcripts from Barker's trial are not in the record before us. In any event, at the Parole Hearing Barker did not dispute the Board's summary of his offenses. Moreover, Barker told a psychologist in 2005 that the facts recited by the Board at the Parole Hearing "are essentially correct." Similarly, the April 2004 life prisoner evaluation report's section entitled "Prisoner's Version" indicates Barker admitted "full responsibility for his part in this offense."

damage." Regarding the fire, Barker admitted at the Parole Hearing that he and a neighbor boy his age had been playing with bottle rockets in his backyard, and they may have accidentally started the fire in the house across the street, but it was not intentional or malicious. No charges were ever filed and Barker was not arrested in connection with this incident.

Regarding torturing animals, Barker admitted during the Parole Hearing he had been cruel to chickens as a young teenager. However, he has since told a psychologist that his behavior was "senseless and stupid, and he is ashamed that he behaved that way." His background otherwise shows he was able to take care of animals, as Barker was an active member in the 4-H club for some seven years (including three years as club president), and he raised cattle, pigeons, rabbits, and chickens.

### 4. *Barker's Conduct While in Prison*

The California Department of Corrections and Rehabilitation received Barker on June 14, 1977, when he was 17 years old. He had not yet completed his high school diploma and had "virtually no work experience or skills." While in prison, Barker has had numerous jobs for which he has received consistent above-average to exceptional ratings. He also obtained his G.E.D. on August 14, 1980, and has completed 45 units in college courses. He completed vocational and on-the-job training as an airframe mechanic, auto mechanic, carpenter, plumber, and clerk. Since 1987, he has participated in numerous therapy and self-help programs. These include the Category T therapy program, Anger Management, House of Healing, Hands of Peace, Four Agreements (a personal development and maturity course), and Advanced Alternatives to Violence. In March 2005, he completed an inmate peer education program to become a peer HIV educator.

Barker has not had any disciplinary problems since 1995, and none of the six earlier disciplinary problems involved violent behavior. The disciplines were: in February 1978 for possessing contraband ($5 belonging to another inmate); in March 1979 for possessing 12 marijuana joints; in April 1979 for allowing another inmate in his cell; in October 1983 for possessing contraband; in September 1990 for manipulating staff; and in June 1995 for smoking in bed. Barker also received four counseling memoranda: in November 1987 for possession of contraband (pornography, sugar, and a bottle of unidentified "flammable liquid substance"); in April 1993 for photos displayed; in May 1993 for covering his cell windows with paper; and in December 1993 for being absent from his vocational assignment. The September 15, 2005 psychological assessment by Cynthia Glines, Psy.D., summed up Barker's record as follows: he "has only had 6 CDC 115 rules violation reports, and of those only one was serious, and none were violent.

He has not had a disciplinary write-up since 1995. Further, his score on the PCL-R [(Psychopathy Checklist-Revised, 2nd ed.) instrument for assessing risk of future violence] . . . was significantly below that of the average inmate, and did not support psychopathy as a risk factor."

### 5. *Barker's Insight into the Crimes*

Braeseke told Barker he wanted to kill his father because he had abused Braeseke, and wanted to kill his mother and 76-year-old grandfather because they had been silent witnesses to the abuse, having done nothing to stop it. Barker admitted he did not know whether Braeseke had ever actually been abused by his father, but that is what Braeseke told him. Barker believed Braeseke was going to commit the murders with or without Barker's help.

At the Parole Hearing, Barker testified regarding why he committed the crimes, testimony which suggested Braeseke was like an older brother or parental figure to him. Specifically, Braeseke was four or five years older than Barker, around the same age as Barker's older brother who had stopped spending time with him some years before the murders. With his brother absent and both his parents working full time, Barker felt unable to relate to his family. He had no guidance, was lost on his own, lacked self-esteem, and was full of self-doubt. Braeseke, on the other hand, had a strong personality, and Barker, fearing Braeseke would reject him, sought his acceptance. He helped Braeseke with the killings because he, Barker, was weak, and had succumbed to Braeseke's persuasion and allowed Braeseke to take control over him. Braeseke "wore [him] down."

Though, as noted, in a September 2005 psychological assessment Barker described his parents as "supportive," he testified at the Parole Hearing that he felt vulnerable because he could not connect with his family, that his father did not teach him life's lessons, and that he did not have any discipline or structure. Despite that, Barker also told the Board he did not blame his family for his crimes. As he summed it up at one point, at the time of the killings he "was a boy who out of misguided loyalty, out of self-doubt and the inability to connect with others, foolishly helped this guy kill his family, and you know, foolishly killed those chickens too."

Barker has accepted full responsibility for his part in the murders since at least 1995. At the Parole Hearing he told the Board he was "terribly sorry" for his crimes, that he had grown up, that he was no longer a person who could be influenced the way he had been at age 16, and that he was no longer a danger to society. And Barker's description of himself found independent support in the record.

### 6. *Letters Received by the Board*

The Board received 10 letters urging that parole be granted. The letters themselves are not in the record, and what we know of their content and authors is from the descriptions by Board Presiding Commissioner Tracey St. Julien and Barker's responses about his relationship with the writers. Most of the letters were from people Barker had met while he was in prison and who had come to know him through various proprisoner programs in which they volunteered or participated, some of whom no longer participated in these programs but nevertheless continued to visit Barker. One such letter was from a marriage and family therapist who described "how long of a way" Barker had come "in accepting responsibility for the crime," and who went on to say that, if paroled, Barker "has solid support from his mother, myself, and my family and many of our friends." Another letter was from Barker's 86-year-old mother, who wrote how she "visited [her] son almost every week since his incarceration . . . [and] watched him and enjoyed seeing him grow from a boy to a man." In sum, these letters offered Barker places to live and personal and financial support upon his release on parole.

The Alameda County District Attorney's office submitted the only letter urging the Board to deny parole. The letter was written by an assistant district attorney with no firsthand knowledge of the case,[10] who without elaboration characterized Barker's crimes as "some of the most gruesome, brutal, senseless and premeditated murders in Alameda County history." The district attorney's position was based on the facts of the commitment offenses, Barker's earlier "lawless behavior," and the conclusion in an April 2004 life prisoner evaluation report that Barker still poses a "moderate degree of threat to the public if released."

### 7. *The Risk to Public Safety*

As discussed at length below, the "overarching consideration" in determining whether to grant parole "is 'public safety.' " (*In re Scott* (2005) 133 Cal.App.4th 573, 591 [34 Cal.Rptr.3d 905] (*Scott II*).) That is, under the applicable "Penal Code section 3041, the Board 'shall set a release date unless it determines that the gravity of the current convicted . . . offenses, or the timing and gravity of current or past convicted . . . offenses, is such that *consideration of the public safety* requires a more lengthy period of incarceration for this individual . . . .' (Italics added.)" (*Ibid.*)

Every psychological evaluation in the record dating back at least to 1999 has concluded Barker would pose little or no danger to public safety if released on parole.

---

[10] The deputy district attorney who wrote the letter in 2005 was at that time only six years into his legal career.

The most recent evaluation was the September 15, 2005 psychological assessment prepared by Dr. Glines, who concluded that "overall test results suggest that the risk for recidivism on a violent crime while in the free community is in the low range." Dr. Glines also concluded Barker did not suffer from a personality disorder and did not need therapy.

Dr. Glines's report noted that a 1986 assessment (not in the record before us) characterized Barker "as an arrogant and haughty young man who viewed himself as a victim of circumstance in relationship to his crime. . . . [The Psychiatric Council] believed [Barker's] judgment to be sound, but 'with occasional incidents marred by youthful immaturity and naiveté.' In their conclusions, they attributed much of his lack of insight, internal conflicts, and personality weakness to his lack of maturity." However, Dr. Glines further noted, even that 1986 report concluded early on that Barker would " 'continue to grow and mature through his own initiative and that psychotherapy is not indicated in this case.' "

Similarly, a psychological evaluation prepared in 2004 by Dr. Henry Greenstone opined that Barker's potential for violence outside of prison was below average, and that it was "highly unlikely" Barker could be influenced again to engage in criminal behavior. Dr. Greenstone described Barker as having "changed from the sixteen-year-old who was incarcerated and can verbalize that he is now 'grown up' and understands the 'terrible ramifications of [his] crime.' [Barker] has improved himself vocationally, educationally, and in his self-awareness and ability to observe his own thinking and behavior." Dr. Greenstone concluded Barker was free of psychopathology and had grown in maturity and insight—this, despite 27 years of living in a prison environment "that had little to teach him regarding appropriate psychosocial development." Dr. Greenstone also concluded that Barker had shown remorse for the crimes. Indeed, during the Parole Hearing Deputy Commissioner D.H. McBean acknowledged that in the psychological evaluations prepared about Barker over the years, the doctors had given Barker more and more credit for the insight he has gained.

The 1999 mental health evaluation done by Dr. Katherine Powell, put before us as an exhibit by the Warden, confirms this as well. Though indicating in her clinical assessment some concerns about Barker's emotional makeup, Dr. Powell's report provided an "Assessment of Dangerousness" where she opined as follows: Barker "has not been a behavior problem and has not acted out in a dangerous manner in the institution. He has been involved in nothing that can be representative of problematic, aggressive, or antisocial behavior. It is highly likely he will continue to live in a well-constructed life and will not become inter-related with any individuals in a manner that will lead him to act out in a way that is based on emotional

content. He simply does not have the internal structure in his personality to participate in this kind of interaction. Therefore, while in the institution, it would be highly surprising if he became a disciplinary problem or committed any crimes. The assessment for dangerous behavior, if released to the community would appear to be generally the same for the same reasons." This, as noted, was an evaluation done some six years before the Parole Hearing.

### 8. *The Board's 2005 Decision*

Presiding Commissioner St. Julien rendered the Board's decisions orally,[11] as follows: "Mr. Barker, we are going to deny your parole. . . . [W]e've reviewed all the information received from the public and relied on the following circumstances in concluding that the inmate is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. Specifically, as it regards to the commitment offense, the offense was carried out in an especially cruel and callous manner in that you and your crime partner, Mr. Braeseke, shot and killed his parents . . . and also his grandfather . . . who was 76 years of age at the time. And this was carried out in a dispassionate and calculated manner in that you and Mr. Braeseke planned the murder, got the weapon, which was a .22 caliber rifle and used it to kill the three people, and so multiple victims were also killed in this crime. And your crime partner was the one who actually killed his parents. And you, Mr. Barker, hit . . . [Braeseke's] grandfather, on the head with a chisel approximately three or four times, and then took the gun that was used on [Braeseke's parents] and shot [the grandfather] twice in the head which caused his death. The offense was carried out in a manner which demonstrates an exceptional callous disregard for human suffering in that again the murders were planned. The victims were particularly vulnerable as they were in their residence and had absolutely no idea what was about to take place. And the motive for the crime was inexplicable or very trivial in relation to the offense in that these murders did not have to take place. At any point in time, you could have let the authorities know what your crime partner was planning. And at various points in time during the event itself, you could have stopped those actions. And these conclusions are drawn from the Statement of Facts . . . ."

After quoting the facts from the April 2004 life prisoner evaluation report (see *ante*, fn. 9), the presiding commissioner continued with the Board's decision: "And in regards to your previous criminal record, you have a juvenile [arrest for] burglary and vandalism. . . . [T]here was an incident with

---

[11] The presiding commissioner told Barker he would receive a copy of the Board's "written tentative decision" on the day of the Parole Hearing. No copy of any such decision was apparently provided, and there is no such written decision in the record.

the sheriffs, and you agreed with that, for burglary and vandalism. And then there [was] some abuse with livestock, in particular chickens. And in terms of your incarceration, your institutional behavior, you have completed many self-help programs and therapy programs, and you also have good vocational skills, although, we only note that you have one vocational skill and you could definitely benefit from securing another one if that's possible. And we'll give you some more comments on this as to what other things you might be doing as you had requested. The psychological report dated September 15, 2005, authored by Dr. Glines, is not totally supportive of release in that . . . her final conclusion states that your risk for recidivism on a violent crime is in the low range. However, she previously states that you're in the low end of the moderate range of risk for future violence. In terms of your parole plans, you appear to have realistic parole plans in that you do have viable residential plans. You have several offers of residence with your friends and mother. And you do have acceptable employment plans, and you do have a marketable skill. And we do note that in response to Penal Code [section] 3042 Notices indicate an opposition to a finding of parole suitability, and we have received such comments from the District Attorney of Alameda County."

Presiding Commissioner St. Julien then stated that the Board made "the following findings, that the inmate needs therapy in order to face, discuss, understand, and cope with stress in a nondestructive manner, and until progress is made, the inmate continues to be unpredictable and a threat to others. And the inmate's gains are recent. He must demonstrate an ability to maintain these gains over an extended period of time." Switching gears, the presiding commissioner next listed Barker's achievements while in prison, commending him "for receiving your GED. You also have approximately 45 units of college [credit], which is definitely a noteworthy achievement, as is your being disciplinary-free since 1995. And you have completed the vocational airframe and power plant. Your job skills include being a plumber and an auto mechanic. And . . . it looks like you've been working very hard on your self-help areas, in the CAT T Program, 1994; [Inmate] Peer Educator, 1995 . . . and Advanced Alternatives to Violence, 2005 as well; Narcotics Anonymous, 1998 to 2001;[12] Anger Management; House of Healing, 2001; Hands of Peace, 1993; and participated in the Personal Growth Seminar in 2001. However, these positive aspects of your behavior do not outweigh the factors of unsuitability."

"[I]n a separate decision" rendered immediately after the one above, the Board found "that the inmate has been convicted of murder, and it is not reasonable to expect that parole would [be] granted at a hearing during the

---

[12] Barker has no record of any substance abuse problems, but Narcotics Anonymous "opened up [his] ability to talk" about things, including his crime.

next three years. And the specific reasons for this are again as it goes to the commitment crime. The offense was committed in an especially cruel manner in that three innocent victims were killed by the inmate and his crime partner. They were the crime partner's parents and grandfather. And the victims were killed with gunshot wounds. The parents were shot with a .22 rifle, and the grandfather was first hit in the head with a chisel three or four times by the inmate and then subsequently shot twice in the head with the .22 rifle. So multiple victims were attacked and killed in this same incident. And the offense was carried out in a dispassionate and calculated manner in that these individuals were in their own home, minding their own business and not having any suspicion at all about what was going to be in store for them. The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering, and the motive for the crime was inexplicable or very trivial in relation to the offense. We can only surmise that the crime partner had a difficult [*sic*] with his parents and wanted them dead. And the recent psychological report dated September 15, 2005, by Dr. Glines indicates a need for a longer period of observation and evaluation and treatment, and therefore, a longer period of observation and evaluation is required before the Board should find that the inmate is suitable for parole. And we recommend that you remain disciplinary-free, if available, upgrade vocationally and educationally, if available, participate in self-help and therapy programming."

The presiding commissioner then discussed "the insight component." She acknowledged Barker felt remorse and was "sorry this happened," but she just did not "see . . . the insight component. And that's . . . a very important component that I think the Board has to feel that you have and you fully understand in order to give you a parole date. Because without you[r] really fully understanding what made you do this . . . not because of the lack of discipline you might have had, or you had too much freedom or . . . anything your parents did or your brother did, and those are things that all played a part . . . in your reckoning all of . . . this situation in your mind . . . not discounting that those things did not happen and that they weren't very serious, but you need to find out why you did this. And . . . it's a hard thing probably for you to face. Like you said, it took you quite awhile just to admit it. And sometimes things are so bad that . . . you just cannot face what you have done. But you have to do that in order to really, really, really put this behind you and not bring in these other factors of what other people did. So I would suggest that you really—and this is something that has to come from within . . . maybe some other self-help."

At this point, Barker's counsel asked the presiding commissioner whether the Board was rendering a three-year denial "because it's going to take [Barker] three years to gain this insight, or is it three years because of the severity of the crime, or is it the combination of those two things?" The

presiding commissioner answered that it was "because [Barker has] been here so long and the insight hasn't come yet." She explained that although Barker was "definitely making progress" and "a significant amount of progress," "the things that you're saying, you say in 1999 . . . in the psych eval[uation] in 1999, it's pretty much the same thing. And this year . . . you just haven't broken that barrier that needs to be broken."

Deputy Commissioner McBean also acknowledged Barker's progress, but to little avail. As the deputy commissioner put it, "But at this point, we feel that you could really benefit from more self-help, and we know there is a limited amount available to you, but . . . you've done well, and . . . you are moving towards participating in things that will increase your sense of compassion, by working with the HIV inmates. . . . And I think that as we read through the psych evaluations and we look at the crime, that there was a big piece missing for you and for many, many years. It's that sense of . . . what is it like to bury an animal alive? What is it like to . . . be killed for no reason? What is it like to be a victim of a senseless crime, and that ability to have compassion for somebody else is a very important part of your recovery. So I see you moving in that direction . . . . But this Panel believes that you just have more work to do. And there's no getting around that heinous nature of the crime. You also have job skills, and that's good. You have only completed one vocational. We recommend you try to get another vocational trade under your belt. You don't have to, but I think it would be important for you. And that's another goal you can set for yourself, and you know, to continue to remain disciplinary-free. So . . . we're not saying that you're not moving in the right direction. We just think that you just have more work to do, sir."

## DISCUSSION

### 1. *The Statutory and Regulatory Scheme*

■ We begin here, as we recently began in *Elkins, supra*, 144 Cal.App.4th at p. 487, "with an overview of the law as summarized in *In re Rosenkrantz* (2002) 29 Cal.4th 616 . . . , and two subsequent decisions of our own court, *In re Scott* (2004) 119 Cal.App.4th 871 [15 Cal.Rptr.3d 32] (*Scott I*), and [*Scott II, supra*,] 133 Cal.App.4th 573 [34 Cal.Rptr.3d 905], and by setting out applicable constitutional, code and regulatory framework.

"Parole suitability decisions for inmates serving indeterminate life terms are made, in the first instance, by the Board. (*Scott I, supra*, 119 Cal.App.4th at pp. 884–885.) The Board has broad discretion, must normally set parole release in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the public safety (*ibid.*; Pen. Code,

§ 3041, subd. (a)), and must set a parole release date unless it determines that the gravity of the current convicted offense or offenses, or their timing and gravity, are such that public safety requires a more lengthy period of incarceration (*Scott I*, at p. 885; Pen. Code, § 3041, subd. (b)). That decision is guided, in turn, by regulations directing the Board's consideration to six nonexclusive circumstances tending to show unsuitability (Cal. Code Regs., tit. 15, [§ 2281], subd. (c)) and nine tending to show suitability (*id.*, [§ 2281], subd. (d)). (*Scott I*, at pp. 888, 897.)" (*Elkins, supra*, 144 Cal.App.4th 475, 487, fn. omitted.)[13]

We explained in *Scott II*, "The specified factors applicable to the Board's . . . parole decisions are set forth in Penal Code section 3041 and Board regulations (promulgated pursuant to subdivision (a) of section 3041) establishing criteria for determining suitability for release on parole. (Cal. Code Regs., tit. 15, [§ 2281].)" (*Scott II, supra*, 133 Cal.App.4th at p. 591.) "The factor statutorily required to be considered, and the overarching consideration, is 'public safety.' " (*Ibid.*)

"The factors required to be considered by Board regulations are for the most part specified in section [2281] of title 15 of the California Code of Regulations, which consists of four subdivisions. [Section 2281, s]ubdivision (a), which reiterates the statutory factor, states that '[r]egardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.' " (*Scott II, supra*, 133 Cal.App.4th at p. 591.)

"Subdivision (b) of section [2281] title 15 California Code of Regulations, provides that '[a]ll relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's[:] social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not

---

[13] The bracketed matter substitutes section 2281 for section 2402 of title 15 of the California Code of Regulations. The reason is that Barker's crime was committed in 1976, and section 2281 applies to his parole proceeding. Scott's crime was committed in 1986 (*Scott II, supra*, 133 Cal.App.4th at p. 579), and is governed by section 2402. There is no substantive difference between section 2281 and section 2402. (*Board of Prison Terms v. Superior Court* (2005) 130 Cal.App.4th 1212, 1232, fn. 5 [31 Cal.Rptr.3d 70].)

firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.' " (*Scott II, supra,* 133 Cal.App.4th at p. 591.)

"California Code of Regulations, title 15, section [2281], subdivision (c) specifies six nonexclusive factors tending to show *unsuitability*, the relative importance of which 'is left to the judgment of the panel.' " (*Scott II, supra,* 133 Cal.App.4th at p. 592.)[14] "Subdivision (d) of section [2281] of California Code of Regulations, title 15, which is the converse of subdivision (c), specifies nine factors tending to show *suitability* for release, leaving the importance to be attached to any circumstance or combination of circumstances in a particular case to the judgment of the panel." (*Scott II, supra,* 133 Cal.App.4th at pp. 592–593.)[15]

The goal of subdivision (a) of Penal Code section 3041, it has been noted, is that "release on parole is the rule, rather than the exception. This section requires that the Board set a release date unless it determines that 'consideration of the public safety requires a more lengthy period of incarceration . . . .' " (*In re Smith* (2003) 114 Cal.App.4th 343, 351 [7 Cal.Rptr.3d 655] (*Smith*); accord, *In re Lee* (2006) 143 Cal.App.4th 1400, 1405 [49 Cal.Rptr.3d 931]

---

[14] The specified unsuitability factors are:

"(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

"(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

"(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

"(C) The victim was abused, defiled or mutilated during or after the offense.

"(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

"(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

"(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

"(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

"(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

"(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

"(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail." (Cal. Code Regs., tit. 15, § 2281, subd. (c).

[15] The specified suitability factors are:

"(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

"(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

"(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of

(*Lee*) ["defendant sentenced to an indeterminate life term is normally entitled to parole if the board finds he does not pose an unreasonable risk to public safety"].)

This, then, is the framework within which we review Barker's petition.

## 2. *The Standard of Review*

■ In denying Barker's habeas corpus petition, the superior court did not conduct an evidentiary hearing. "This is therefore an original proceeding in which we independently review the record." (*In re Scott, supra,* 119 Cal.App.4th at p. 884 (*Scott I*).) And our review is under the deferential "some evidence" standard. (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 658 (*Rosenkrantz*); *Elkins, supra,* 144 Cal.App.4th at p. 488 ["Court review of the Board's decision is governed by a deferential 'some evidence' standard designed to ensure minimum procedural due process protection"].)[16]

In applying the "some evidence" standard, we are "precluded from independently resolving conflicts in the evidence, determining the weight to be given the evidence, or deciding the manner in which the specified factors relevant to parole suitability are to be considered and balanced, because these are matters exclusively within the discretion of the Board. Indeed, '[i]t is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole.' (*Rosenkrantz, supra,* 29 Cal.4th at p. 677.)" (*Scott I, supra,*

---

remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or the prisoner has given indications·that he understands the nature and magnitude of the offense.

"(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress had built over a long period of time.

"(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome . . . .

"(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

"(7) Age. The prisoner's present age reduces the probability of recidivism.

"(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

"(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release." (Cal. Code Regs., tit. 15, § 2281, subd. (d).)

[16] The Attorney General inexplicably argues that Barker does not have a liberty interest in parole and thus the Board's decision should not be reviewed under the "some evidence" standard. Our Supreme Court has made it very clear that "prisoners possess a protected liberty interest in connection with parole decisions rendered by the Board," and that imposing "a standard of review that is less stringent than the 'some evidence' test . . . would permit the Board to render a decision without any basis in fact" which "would be arbitrary and capricious, thereby depriving the prisoner of due process of law." (*Rosenkrantz, supra,* 29 Cal.4th at pp. 661, 657.) This holding of *Rosenkrantz* was cited and confirmed in *Elkins, supra,* 144 Cal.App.4th 475, 488, which was filed on October 31, 2006, three weeks before the Warden's return here was signed and filed.

119 Cal.App.4th at p. 899.) "Only a modicum of evidence is required" to satisfy the "some evidence" standard. (*Rosenkrantz, supra,* 29 Cal.4th at p. 677.) However, that evidence " ' "must have some indicia of reliability" ' " (*Scott I, supra,* 119 Cal.App.4th at p. 899) and " 'suitability determinations must have some rational basis in fact.' " (*Elkins, supra,* 144 Cal.App.4th at p. 489.)

As our Supreme Court has summarized it, "the judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but . . . in conducting such a review, the court may inquire only whether *some evidence* in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation. If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." (*Rosenkrantz, supra,* 29 Cal.4th at p. 658, italics added.)

Finally, as has been recently stated, because the overarching consideration is public safety, the test in reviewing the Board's decision denying parole "is not whether some evidence supports the *reasons* [the Board] cites for denying parole, but whether some evidence indicates a parolee's release *unreasonably endangers public safety.* [Citations.] Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." (*Lee, supra,* 143 Cal.App.4th at p. 1408, fn. omitted.)

### 3. *No Evidence Supports the Board's Findings*

As quoted above, the Board actually made two of what it referred to as "findings": "that the inmate needs therapy in order to face, discuss, understand, and cope with stress in a nondestructive manner, and until progress is made, the inmate continues to be unpredictable and a threat to others. And the inmate's gains are recent. He must demonstrate an ability to maintain these gains over an extended period of time." We begin our discussion with these findings, and conclude there is not "some evidence" supporting either of them. Indeed, the record is 180 degrees to the contrary.

Regarding the Board's first finding, that Barker needed therapy, none of the recent psychological reports in the record mentions any need for therapy—or, for that matter, any difficulty in dealing with stress in a nondestructive manner. To begin with, the April 26, 2004 report by Dr. Greenstone praises

Barker for maturing and growing in judgment and insight, and commends Barker for his development despite having grown up in prison, "an environment that had little to teach him regarding appropriate psychosocial development." More on point is Dr. Glines's assessment in her September 15, 2005 report, which could not be clearer: "[t]here are no therapeutic recommendations at this time." And, as noted, she concluded that the risk Barker would commit another violent crime is low.

None of this is surprising, as the psychological reports as early as 1982—when Barker was 22 years old—were all of the same opinion: no therapy was required. Illustrative is the Board's decision denying parole in 1982, which expressly acknowledged the Board panel "was aware of, and commends [Barker] for his positive work efforts, and the panel further notes that the psychiatric reports indicate that [Barker] has no mental disorder and is not in need of therapy." The 1984 Board decision was the same. And neither the Board's 1986 nor 1987 decisions mention any professional recommendation for therapy.

These conclusions, of course, are the opinions of trained experts, all of whom said Barker did not need therapy. We are troubled therefore by a contrary finding, especially in light of the uncontradicted evidence in the record. And we are particularly troubled by the mere presence of this finding, which appears to be, yet again, a boilerplate finding that seems to make its way into every denial of parole, whatever the record—and despite repeated criticisms from the courts. The harsh criticism by Division Three of this court in *In re Ramirez* (2001) 94 Cal.App.4th 549 [114 Cal.Rptr.2d 381], disapproved on another ground in *In re Dannenberg* (2005) 34 Cal.4th 1061, 1086–1087, 1100 [23 Cal.Rptr.3d 417, 104 P.3d 783] (*Dannenberg*), is illustrative. There, Justice Parrilli first described the finding of the "need for further therapy" as an even "more troubling aspect" of the Board's decision, explaining why it was utterly unfounded. She then concluded as follows: "This finding was an affront not only to Ramirez, whose progress in therapy was undisputedly exemplary, but also to the Department of Corrections, which provided the therapeutic programs and found Ramirez's participation in them to be outstanding. The Board's readiness to make a finding so at odds with the record supports Ramirez's claim that his parole hearing was a sham. It is not surprising that the trial court regarded the Board's findings with deep suspicion." (*Ramirez, supra,* 94 Cal.App.4th at p. 571.) We made a similar observation in *Scott I, supra,* 119 Cal.App.4th 871, noting that the finding

Scott " 'needs [further] therapy' . . . is as bereft of factual support as the similar finding in *Ramirez*," whose criticism we went on to quote. (*Id.* at pp. 896–897.)[17]

The Board's second finding, that Barker's gains are recent, is likewise unsupported by "some evidence." As the Board itself acknowledged, Barker has been "disciplinary-free since 1995." More importantly, as mentioned above, Barker has taken responsibility for his crimes since at least 1995—and perhaps as early as 1990. As Dr. Greenstone's evaluation recites, Barker has "matured and grown in judgment and insight. He has written a twenty-page letter (in his Central File) *dated 11-06-00*, outlining his state of mind at the time of the offense, his difficulty with but eventual acceptance of his role in the crime, and his remorse over what happened."

Moreover, review of earlier Board decisions also suggests many of the suitability factors which the Board itself acknowledges Barker has satisfied (and which we discuss, *post*) are not recent gains. Rather, from all indications Barker's gains began long ago, and have been consistent. He has participated in, and completed, self-help programs going back over 20 years; and he has not received even a minor infraction in over 10 years. Those gains are hardly "recent."

That they are not is confirmed in spades in the Warden's own return, his argument describing the record this way: "Barker admitted that he had only recently, in approximately 1995, accepted responsibility for the crime. [Citation.] [his October 6, 1997 review hearing noted that Barker stated 'he can now take responsibility for crime(s), not lie and give [the Board] "half truths" '].) . . . Barker said that he was different now because he is a 'thinking adult,' he realized he is not weak, he does not allow himself to be used, and he has something to contribute. [Citation.] Barker said he has learned too much to act out or commit heinous acts. [Citation.]" How can gains demonstrated more than 10 years ago be called "recent"? To ask the question is to answer it. There is not "some evidence" of recency.

■ Nor is this a valid reason for denying parole in any event. None of the suitability factors require that a prisoner's gains be maintained "over an extended period of time," as the Board's decision states. (See Cal. Code of Regs., tit. 15, § 2281, subd. (d) [suitability factors].)[18] As we said in *Elkins,* "There is no minimum time requirement. Rather, acceptance of responsibility works in favor of release '[no] matter how longstanding or recent it is,' so

---

[17] We note that the Warden may be distancing himself from such a finding, as the summary of the argument in his return eschews any reliance on any need for therapy.

[18] All unspecified section references hereafter are to title 15 of the California Code of Regulations.

long as the inmate 'genuinely accepts responsibility . . . .' [Citation.]" (*Elkins,
supra*, 144 Cal.App.4th at p. 495.) Or as the Court of Appeal put it in *Lee,
supra*, 143 Cal.App.4th at p. 1414: "To deny parole, the reason must relate to
a defendant's continued unreasonable risk to public safety. So long as [the
inmate] genuinely accepts responsibility, it does not matter how longstanding
or recent it is. As Justice Felix Frankfurter observed, 'Wisdom too often
never comes, and so one ought not to reject it merely because it comes late.'
(*Henslee v. Union Planters Bank* (1949) 335 U.S. 595, 600 [93 L.Ed. 259,
69 S.Ct. 290] (dis. opn. of Frankfurter, J.).) The same can be said about
responsibility and remorse."

In sum, the only two "findings" actually made by the Board are not
supported in the record. The Board, however, did recite other conclusions in
the course of its decision denying Barker parole, and we turn to a discussion
of them, again in the context of the statutory/regulatory framework.

#### 4. *The Suitability Factors Support Barker*

As set forth above, the regulation specifies six nonexclusive factors for
unsuitability (§ 2281, subd. (c)) and nine factors for suitability (§ 2281,
subd. (d)). The regulation further provides that as to the unsuitability factors,
their relative importance "is left to the judgment of the panel," (§ 2281,
subd. (c)) and as to the suitability factors, "the importance attached to any
circumstance or combination of circumstances in a particular case is left to
the judgment of the panel" (§ 2281, subd. (d)).

Nine factors showing suitability for parole are listed in the regulations,
eight of which could possibly pertain to Barker.[19] Two of these factors—
realistic plans for release or development of marketable skills (§ 2281,
subd. (d)(8)) and institutional activities indicating "an enhanced ability to
function within the law upon release" (§ 2281, subd. (d)(9))—were favorably
commented on by the Board. In particular, the Board acknowledged Barker
had "been working very hard on [his] self-help areas," and listed eight
programs he had participated in while in prison. The Board noted Barker had
"good vocational skills," later mentioning he had completed vocational
training in airframe and power plant and that his skills included "being a
plumber and an auto mechanic."[20] The Board also noted that Barker had
"realistic parole plans," including viable residential plans both with friends
and with his mother, and that he had "acceptable employment plans" and
"marketable skills." Finally, the Board commended Barker for obtaining

---

[19] The battered woman syndrome factor (§ 2281, subd. (d)(5)) cannot.

[20] Earlier the Board observed that Barker had "one vocational skill and [he] could definitely
benefit from securing another one if that's possible." The fact is Barker had multiple vocational
skills, as an airframe mechanic, auto mechanic, carpenter, plumber, and clerk.

his G.E.D. and 45 units of college credit, the latter of which the Board called "definitely a noteworthy achievement." And with it all Barker was "disciplinary-free since 1995." All this, of course, demonstrated that Barker had enhanced his ability to function outside of prison. (§ 2281, subd. (d)(8), (9).)

The Board did not comment on the remaining six suitability factors.[21] However, any objective review of the record demonstrates beyond peradventure that at least five of these apply to Barker as well.[22] Barker has no record as a juvenile of assaulting others or committing crimes with harm to victims. (§ 2281, subd. (d)(1).) He has no history of violent crime. (§ 2281, subd. (d)(6).) He acknowledged the nature and magnitude of his crime and accepted responsibility for it. (§ 2281, subd. (d)(3).) His conduct in prison and the numerous letters from the people Barker met while he was there demonstrate that he has experienced reasonably stable relationships with others. (§ 2281, subd. (d)(3).) And his maturation, growth, understanding, insight, and age reduce the probability of recidivism, as confirmed by the psychological evaluations. (§ 2281, subd. (d)(7).)

### 5. The Unsuitability Factors Do Not Support Denial of Parole and the Board's Reliance on the Circumstances of the Commitment Offenses Violated Barker's Due Process Rights

█ There are, as noted, six factors indicating unsuitability, only one of which was cited by the Board here: that the "offense was carried out in an especially cruel and callous manner."[23] This is a reference to section 2281,

---

[21] "The Board's failure to undertake the 'individualized consideration of all relevant factors' required by *Rosenkrantz, supra,* 29 Cal.4th at page 655, also offends the Board's own regulations, which require that '[a]*ll* relevant, reliable information available to the panel *shall be considered* in determining suitability for parole.' ([§ 2281], subd. (b), italics added.)" (*Scott I, supra,* 119 Cal.App.4th at p. 898.)

[22] The suitability factor that might not pertain is that Barker committed the crimes "as the result of significant stress in his life, especially if the stress had built over a long period of time." (§ 2281, subd. (d)(4)).

[23] The other five factors demonstrating unsuitability are that the prisoner (1) has a previous record of violence; (2) has an unstable social history; (3) has previously sexually assaulted another individual in a sadistic manner; (4) has a lengthy history of severe mental problems related to the offense; and (5) has engaged in serious misconduct while in prison. (§ 2281, subd. (c)(2)–(6).) None of these was mentioned, much less relied on, by the Board, and they are properly disregarded here. (See *Elkins, supra,* 144 Cal.App.4th at p. 493; *Scott II, supra,* 133 Cal.App.4th at pp. 595–596.) In any event, not one of the five finds any support in the record.

It is true that the presiding commissioner observed that Barker had "a juvenile burglary and vandalism" and "there [was] some abuse with livestock, in particular chickens." However, there is no evidence in the record that either the incident leading to Barker's arrest for burglary and vandalism or his abuse of chickens involved an actual or potential risk of harm to people.

subdivision (c)(1), which indicates a prisoner may be unsuitable if he committed the crime "in an especially heinous, atrocious or cruel manner," and which goes on to list five factors to be considered in determining whether the crime was committed in that manner: "(A) Multiple victims were attacked, injured or killed in the same or separate incidents. [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. [¶] (C) The victim was abused, defiled or mutilated during or after the offense. [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. [¶] (E) The motive for the crime is inexplicable or very trivial in relation to the offense." (§ 2281, subd. (c)(1)(A)–(E).)

After stating Barker's offenses were committed in "an especially cruel and callous manner," the Board proceeded to list, however conclusorily, four of the five listed factors. Specifically, the Board first stated that Barker and Braeseke "shot and killed his parents . . . and also his grandfather . . . who was 76 years of age at the time." The Board next stated the commitment offenses were "carried out in a dispassionate and calculated manner" (§ 2281, subd. (c)(1)(B)) because Barker "and Mr. Braeseke planned the murder, got the weapon . . . and used it to kill the three people." And "multiple victims were also killed in this crime." (§ 2281, subd. (c)(1)(A).) These offenses, the Board stated, were "carried out in a manner which demonstrates an exceptional[ly] callous disregard for human suffering" (§ 2281, subd. (c)(1)(D)) based on evidence "the murders were planned" and "[t]he victims were particularly vulnerable as they were in their residence and had absolutely no idea what was about to take place." Finally, the Board stated "the motive for the crime was inexplicable or very trivial in relation to the offense" (§ 2281, subd. (c)(1)(E)), apparently premised on the basis "that these murders did not have to take place. At any point in time, [Barker] could have let the authorities know what [his] crime partner was planning. And at various points in time during the event itself . . . [Barker] could have stopped those actions."

We discuss these observations in turn in light of the principles applicable to a denial of parole where the Board relies on the nature and circumstances of commitment offenses, which principles are these:

---

Thus, neither incident comes within the ambit of the unsuitability factor which provides as follows: "Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age." (§ 2281, subd. (c)(2); cf. § 2281, subd. (d)(1) [listing as a suitability factor no juvenile record of "assaulting others" or "committing crimes with a potential of personal harm to victims"].)

"The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole." (*Rosenkrantz, supra*, 29 Cal.4th at p. 682.) However, Chief Justice George noted in the next paragraph, "In some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation—for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense. . . . 'The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is "normally" to be granted. . . . [A] life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date.' " (*Rosenkrantz, supra*, 29 Cal.4th at p. 683.)

■ We observed in *Scott II* that, the "assumption that a prisoner may be deemed unsuitable for release on the basis of the commitment offense 'alone' is correct [citation], but the proposition must be properly understood. The commitment offense is one of only two factors indicative of unsuitability [which] a prisoner cannot change . . . . Reliance on such an immutable factor 'without regard to or consideration of subsequent circumstances' may be unfair [citation], and 'runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.' [Citation.] The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time. [Citation.] Thus, denial of release based solely on the basis of the gravity of the commitment offense warrants especially close scrutiny." (*Scott II, supra*, 133 Cal.App.4th at pp. 594–595, fns. omitted.) As we recently elaborated on this concept in *Elkins*, "it violates due process to deny parole ' "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense." ' " (*Elkins, supra*, 144 Cal.App.4th at p. 497.)

It is true that Barker participated with Braeseke in "planning" the murders, a word mentioned several times in the Board's decision. Since he did, the murders could be said to be "dispassionate and calculated," though they were not "execution-style" murders, the example given in the regulation. And while the murders were "planned," we fail to see how planning could by

itself demonstrate an *"exceptionally* callous disregard for human suffering" (§ 2281, subd. (c)(1)(D), italics added) as, except for felony murders, first degree murders by definition involve premeditation and deliberation (Pen. Code, § 189).

Further, Barker's murder of Braeseke's grandfather did not involve any of the characteristics that make a first degree murder particularly egregious under the Board's own matrix for setting base terms for life prisoners in section 2282, subdivision (b). There was no torture, as where the "[v]ictim was subjected to the prolonged infliction of physical pain through the use of nondeadly force prior to act resulting in death." (§ 2282, subd. (b).) Nor was there infliction of severe trauma not involving immediate death, as where "[d]eath resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim." (*Ibid.*) And there was no murder for hire. (*Ibid.*)

Barker's petition appropriately concedes that Braeseke's grandfather did suffer until he was shot, but goes on to assert that the murder was no "more callous, dispassionate, calculated, cruel or committed with more disregard for suffering than most such offenses." Without in any way minimizing the severity of Barker's crimes, we agree with this argument. (See *Scott I, supra,* 119 Cal.App.4th at p. 891 ["the offense in question must have been committed in a more aggravated or violent manner than that ordinarily shown in the commission of . . . murder"]; see *Lee, supra,* 143 Cal.App.4th at p. 1409 ["The measure of atrociousness is not general notions of common decency or social norms, for by that yardstick all murders are atrocious"].)

As to the two convictions for second degree murder, they were for the killings of Braeseke's parents, both of whom were shot by Braeseke and who apparently died instantly. Barker's convictions were thus for his participation in the planning and preparation and for his conduct following the murders. "[A]*ll* second degree murders by definition involve some callousness—i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others. [Citation.]" (*Smith, supra,* 114 Cal.App.4th 343, 366.) But however horrific the murders, however horrific the outcome of Barker's participation, again it is difficult to discern how that participation can be considered anything other than the minimum for "malice aforethought." (See *Dannenberg, supra,* 34 Cal.4th at p. 1095 ["violence or viciousness . . . must be more than *minimally necessary to convict . . .*"].)

The Board's observation that "[m]ultiple victims were also killed" is, of course, accurate. It is also among the "immutable" facts of the crimes which, "Given the lapse of 2[9] years and the exemplary rehabilitative gains made by [Barker] over that time, continued reliance on these aggravating facts of the crime no longer amount[s] to 'some evidence' supporting denial of parole." (*Elkins, supra,* 144 Cal.App.4th at p. 498.) Moreover, as Barker argues, it could be said that reliance on this factor could be viewed as a dual use of facts, as one victim was killed in each of the three crimes for which Barker was convicted, and for each of which he has already received a separate sentence.

■ Regarding the Board's statement that "the motive for the crime was inexplicable or very trivial," as we observed in *Scott I,* "The Board did not indicate whether it found [Barker's] motive 'inexplicable' or 'very trivial in relationship to the offense,' as it could not be both." (*Scott I, supra,* 119 Cal.App.4th at p. 892.) "An 'inexplicable' motive, as we understand it, is one that is unexplained or unintelligible, as where the commitment offense does not appear to be related to the conduct of the victim[s] and has no other discernible purpose. A person whose motive for a criminal act cannot be explained or is unintelligible is therefore unusually unpredictable and dangerous." (*Id.* at p. 893.) Barker's motive was not "inexplicable" under this definition.

It is undisputed that Barker committed the crime because (1) Braeseke told him that Braeseke's father had abused Braeseke, and that the mother and grandfather had done nothing to stop the abuse; and (2) Barker, 16 years old at the time, sought the older Braeseke's acceptance and succumbed to his persuasion.

Similarly, the record does not indicate that Barker's motive was "very trivial in relation to [his] offense." (§ 2281, subd. (c)(1)(E).) "The offense committed by most prisoners serving life terms is, of course, murder. Given the high value our society places upon life, there is no motive for unlawfully taking the life of another human being that could not reasonably be deemed 'trivial.' The Legislature has foreclosed that approach, however, by declaring that murderers with life sentences must 'normally' be given release dates when they approach their minimum eligible parole dates. . . . The reference in Board regulations to motives that are 'very trivial in relationship to the offense' therefore requires comparisons; to fit the regulatory description, the motive must be materially less significant (or more 'trivial') than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily presented." (*Scott I, supra,* 119 Cal.App.4th at p. 893.)

Turning lastly to the presiding commissioner's comment that "at various points in time . . . [Barker] could have stopped those actions," the complete answer is found in *Elkins*: "Because it violates due process to deny parole ' "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense" ' (*Scott II, supra*, 133 Cal.App.4th at p. 598), the [Board] could not rely on the fact that [Barker] might have avoided killing to show his killing to be especially brutal." (*Elkins, supra*, 144 Cal.App.4th at p. 497.)

We are mindful of a position recently asserted by the California District Attorneys Association (CDAA) in its amicus curiae support for a petition seeking review or depublication of our opinion in *Elkins*. Commenting on our discussion about the caution with which the immutable facts of the crime must be applied, the CDAA urged that "as advocates for victims, prosecutors recognize that the ability of victims to imagine their loved one's last moments and to relate their feelings regarding the pain and suffering their loved one experienced empowers those victims and allows them to feel as though they have a voice in the administration of justice. To the Court of Appeal, after a period of time, the commitment offense becomes irrelevant. To the victims of violent crime, the circumstances of the crime are indelibly stamped upon their memories and are never irrelevant."

To begin with, nowhere in *Elkins* did we say the facts of the crime become "irrelevant." What we said is they are immutable. (*Elkins, supra*, 144 Cal.App.4th at pp. 496, 498.) And while we are not aware of any victims (or family of victims) in the setting here, not for a moment do we ignore the lasting effect a crime may have on a victim or a victim's family, an effect that may well never diminish, let alone disappear. That said, the effect on the victim is not, and cannot be, the guiding factor in a parole hearing, especially as it is not even mentioned as an unsuitability factor.

#### 6. *There Is No Evidence of Any Threat to Public Safety*

■ As discussed above, the "overarching" factor determining whether parole should be granted or denied is whether the criminal poses "an unreasonable risk of danger to society." (*Scott II, supra*, 133 Cal.App.4th at p. 591; § 2281, subd. (a); see *Lee, supra*, 143 Cal.App.4th at p. 1409.) As also discussed above, every psychological evaluation in the record dating back at least to 1999 has concluded Barker would pose little or no danger to public safety if released on parole.

The presiding commissioner did note in her decision that Dr. Glines's September 15, 2005 psychological report was "not totally supportive of

release in that . . . her final conclusion states that [Barker's] risk for recidivism on a violent crime is in the low range. However, she previously states that [Barker] is in the low end of the moderate range of risk for future violence." This observation is, in a word, inaccurate. Dr. Glines clearly stated her overall conclusion was that Barker's risk for recidivism on a violent crime was in the low range. In reaching this conclusion, she used three instruments, two of which indicated Barker was a low risk and only one of which (the "Violence Risk Appraisal Guide") showed results "within the low end of the moderate range of risk." In sum, at no point in her report did Dr. Glines opine Barker was "in the low end of the moderate range of risk for future violence." The Board's observation is not supported.

■ Last, but by no means incidentally, the Board failed to consider Barker's age at the time he committed the crimes. In *Elkins, supra*, 144 Cal.App.4th 475, we agreed with the observations of the federal district court in *Rosenkrantz v. Marshall* (C.D.Cal. 2006) 444 F.Supp.2d 1063, that " 'the general unreliability of predicting violence is exacerbated in [a] case by . . . petitioner's young age at the time of the offense [and] the passage [in that case] of nearly twenty years since that offense was committed . . . .' " (*Elkins, supra*, at p. 500.) There, granting the petition for habeas corpus, the district court talked of Rosenkrantz's age, one month past 18. (*Rosenkrantz v. Marshall, supra*, 444 F.Supp.2d at p. 1085.) This fact, the district court noted, "diminished further" the "reliability of the facts of [Rosenkrantz's] crime as a predictor for his dangerousness." (*Ibid.*) Stating that "[w]hile [Rosenkrantz] was not legally a minor, he was very close to being one," the district court confirmed the recognition by the United States Supreme Court that the "evidentiary/predictive value of the conduct of such a young person is diminished." (*Ibid.*) Then, after making the statement quoted by us in *Elkins*, the district court went on to quote various observations of the Supreme Court about young criminals: "Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. *See Stanford* [*v. Kentucky* (1989) 492 U.S. 361, 395 [106 L.Ed.2d 306, 109 S.Ct. 2969].] (Brennan, J., dissenting). The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, '[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.' *Johnson* [*v. Texas* (1993) 509 U.S. 350, 368] [125 L.Ed.2d 290, 113 S.Ct. 2658][;] *Roper v. Simmons* [(2005)] 543 U.S. 551, 561–562

[161 L.Ed.2d 1, 125 S.Ct. 1183]; *see also Thompson v. Oklahoma* [(1988)] 487 U.S. 815, 835 [101 L.Ed.2d 702, 108 S.Ct. 2687] (Stevens, J.) (plurality opinion) ('[L]ess culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult. . . . Inexperience, less intelligence and less education make a teenager less able to evaluate the consequences of his or her conduct while at the same time he or she is more apt to be motivated by mere emotion or peer pressure than as an adult.')" (*Rosenkrantz v. Marshall, supra,* 444 F.Supp.2d at p. 1085, fn. omitted.) These observations are a fortiori applicable to the 16-year-old Barker who committed the crimes here.

In sum and in short, the record before us contains no evidence Barker poses an unreasonable risk to public safety even under the deferential "some evidence" standard.[24]

## CONCLUSION AND DISPOSITION

 The crimes Barker committed and for which he was convicted were horrific, resulting in the senseless deaths of three people. Those crimes cannot be excused. Or minimized. At the same time, the system provides for parole in appropriate circumstances, if the prisoner has met the prerequisites for release. Resolution of these competing considerations led to the conclusion of the Court of Appeal granting Wen Lee's petition for habeas corpus: "All murders represent the basest form of human behavior. Our laws, however, provide for mechanisms by which even murderers, in limited circumstances, are entitled to be paroled. The judiciary has an obligation to execute those laws. The record establishes that Lee does not pose an unreasonable risk to public safety. Any contrary conclusion lacks any evidentiary support." (*Lee, supra,* 143 Cal.App.4th at p. 1414.)

---

[24] Barker's petition makes four additional arguments: (1) the "some evidence" standard of judicial review should not apply because it is insufficient to protect his due process rights; (2) the Board's separate decision to defer Barker's next parole hearing for three years was arbitrary and violated his due process rights; (3) the Board's antiparole bias violated Barker's due process rights; and (4) the Board's use of the statutes and regulations promulgated under the determinate sentencing law violated his due process rights as well as the ex post facto clauses of the federal and state Constitutions All these arguments are, of course, moot in light of our decision here.

Nevertheless, we note certain of these arguments are apparently made as a matter of routine, despite that they have been consistently rejected. For example, the argument that the "some evidence" rule does not apply has been rejected in both *Rosenkrantz* and *Elkins* (*Rosenkrantz, supra,* 29 Cal.4th at pp. 652–658; *Elkins, supra,* 144 Cal.App.4th at p. 488), as has the retroactivity/ex post facto argument. (*Rosenkrantz, supra,* 29 Cal.4th at pp. 636–652; *Elkins, supra,* 144 Cal.App.4th at pp. 489–490.) Such arguments should not be made, at least not without recognizing the earlier holding(s) and without argument why any such holding was wrong.

This, we conclude, describes the record as to Barker as well. Barker's petition for writ of habeas corpus is granted, and the Board is ordered to vacate the denial of parole and to conduct a new parole suitability hearing for Barker no later than July 27, 2007. At that hearing, the Board shall consider evidence of all relevant circumstances identified in its own regulations as tending to show a prisoner suitable for release from prison.

Kline, P. J., and Lambden, J., concurred.