73 Cal.Rptr.3d 581 (2008)
161 Cal.App.4th 14
In re Clarence BURDAN on Habeas Corpus.
No. C056099.
Court of Appeal of California, Third District.
March 24, 2008.
*585 Michael Satris, under appointment by the Court of Appeal, Bolinas, for Petitioner.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Jennifer A. Neill, Supervising Deputy Attorney General, and Pamela B. Hooley, Deputy Attorney General, for Respondent.
HULL, J.
On the evening of November 22, 1983, Clarence Burdan shot and killed his wife while the two sat in her car in front of their residence discussing their marital problems. Burdan thereafter entered a negotiated plea of guilty to second degree murder and, on June 21, 1984, was sentenced to an indeterminate term of 15years-to-life in state prison.
On February 9, 2005, the Board of Parole Hearings (Board) conducted a parole consideration hearing and found Burdan suitable for parole. However, the Governor reversed the Board's decision, concluding Burdan's release would pose an unreasonable risk to public safety because of the "grave" nature of the conviction offense.
Burdan filed a petition for writ of habeas corpus in the superior court, which that court denied on August 7, 2006. On June 29, 2007, Burdan filed a petition for writ of habeas corpus in this court. On August 16, 2007, we issued an order to show cause to Matthew C. Kramer, Warden of Folsom State Prison (the Warden) in order to review the Governor's decision.
The Warden filed a return to our order to show cause and Burdan filed a denial to the return. We conclude the Governor's decision is not supported by the record and grant the petition.

Facts and Procedural History
At his parole consideration hearing, Burdan acknowledged the accuracy of the information concerning the underlying murder as set forth in the 1984 probation report. That report reveals the following:
Burdan married the victim. Charity Adams, in April 1974. At the time of the murder, they had two children.
At approximately 8:00 p.m. on November 22, 1983, Stephen Hall, a Sacramento police officer who was off duty and at home at the time, walked outside and heard a horn honk and a female voice calling his name with some urgency. Hall lived next door to the Burdans. Hall began walking toward a Honda Civic in which he could see Burdan and his wife arguing and struggling.
When Hall got within five feet of the car, he heard three small-caliber gunshots. He immediately ran back into his house and retrieved his own gun. When Hall came back outside, he heard two more shots.
Hall yelled at Burdan to open the car window, and Burdan complied. Hall could see that Burdan was fumbling with something on his lap and heard him say several times, "`I can't make it work. I can't make it work. I want to finish the job.'" Burdan was emotionally upset, shaking, nervous and distraught.
Hall reached in and grabbed a handgun away from Burdan. Burdan struggled briefly over the gun, saying, "`I want to finish this.... I want to make it work.'" Hall got Burdan out of the car, where Burdan said, "`Steve, give me your gun. I won't hurt you. I just want to kill myself.' " Hall pulled Burdan away from the *586 car with some difficulty, because Burdan "was walking very poorly and was not well coordinated." Burdan kept asking for Hall's gun and appeared to be looking at Hall as if to size him up and determine if he could take the gun by force. Hall knocked Burdan to the ground.
Hall eventually handcuffed Burdan to a light post and said he wanted to check on Burdan's wife. Burdan said, "`Steve, it's no use. I know she's dead.'"
The victim had eight gunshot wounds, five entry and three exit. One wound was to the left temple, two to the upper right temple, one on the left side of the neck, one on the right side of the neck, and three to the chest.
The handgun used by Burdan was a single-action, .22-caliber revolver. In order to make the gun fire, it was necessary to cock the hammer before each shot. Burdan had borrowed the gun the day before from an acquaintance. At the time, he told the acquaintance he wanted the gun for target practice. The gun was loaded when Burdan received it. Five live rounds of ammunition were found in Burdan's jacket after he was taken into custody.
It was later revealed that Burdan and his wife had been having marital difficulties for a month or two before the shooting. Burdan had discovered that his wife had begun a sexual affair with a female coworker. He had in fact' observed his wife and the other woman engaging in Sex at the coworker's home two or three days before Burdan committed the crime. Burdan had briefly moved out of the home, but then returned and made his wife move out the day before the shooting.
On the day of the shooting, Burdan had apparently called his wife and arranged to meet with her that evening. Also on that day, the victim called her sister and told her that she had informed Burden she was leaving him, he had asked her to stay, she had said she could not, and Burdan had said he understood.
A neighbor told police the victim had spoken with her two weeks before the murder and said she was afraid that Burdan was going to do something to hurt himself. The victim said Burdan was depressed and indicated he needed to see a psychiatrist. Others also reported that Burdan appeared depressed for about two weeks before the murder. A coworker described Burdan as being "close-mouthed and keeping his personal business to himself." He noticed something had been bothering Burdan for about a month before the murder, that his production had declined, and that Burdan would just sit and stare at the floor for long periods of time. The coworker had also seen Burdan crying.
The victim's sister, who was living with the Burdans at the time, revealed that the day before the murder, Burdan was acting hostile and she was afraid something was going to happen. The victim's mother stated that the day before the murder, the victim told her she was staying with a friend because Burdan had beaten her up and she was afraid of him.
Burdan told the probation department in 1984 that he moved out of the home in October 1983 because of marital problems. He said he wanted a divorce, but the victim did not. He said he accused the victim of spending a lot of time with her coworker but she said she it did not matter how he felt because she would continue doing as she pleased. Burdan said that a few days before the murder, he went to the other woman's home and saw her and his wife making love together. He confronted them and later told the victim to move out. Burdan acknowledged he slapped her. The next morning she moved out.
Burdan admitted borrowing the handgun from a friend and purchasing ammunition. *587 He said the plan at the time was to kill himself. He said he arranged to meet the victim to discuss bills and, when she arrived at their home, got into the car with her. They smoked cigarettes and talked for a while. She eventually threw her wedding ring on the dashboard, and he did the same. She refused to discuss their marriage problems or her new lover.
At one point, the victim said, "`What are you going to do, kill me?'" Burdan pulled out the handgun and she grabbed it with both hands and started screaming. As they struggled over the gun, it went off. Burdan said he did not know how many times the gun went off but later learned it had been five times. He said he then put the gun to his own head and pulled the trigger. However, it did not go off. He said he was trying to load another shell into the gun when Officer Hall arrived and took it from him. Burdan acknowledged trying to take Hall's gun from him to use on himself.
As noted above, Burdan entered a negotiated plea of guilty to second degree murder and was delivered to the custody of the Department of Corrections and Rehabilitation on June 29, 1984. The Board set a minimum parole eligibility date of June 7, 1992.
Between 1991 and 2002, Burdan appeared before the Board on seven occasions and was denied parole each time. On May 13, 2003, Burdan again `appeared before the Board, but this time was found suitable for parole. However, on October 3, 2003, then Governor Davis reversed the Board's decision. Burdan's subsequent petitions for writ of habeas corpus in the superior court and this court were denied, and both the California Supreme Court and the United States Supreme Court denied review.
On January 1, 2005, Burdan filed a petition for writ of habeas corpus in the United States District Court challenging the Governor's 2003 parole decision.
On February 9, 2005, Burdan again appeared before the Board and the Board again found him suitable for parole. The Board specifically found Burdan "would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison." Among other things, the Board cited the fact Burdan had no prior criminal record, has had reasonably stable relationships with others, has enhanced his ability to function within the law through various programs and educational opportunities while in prison, has participated in a variety of self-help and therapy programs, has had no major infractions while in prison, and has a number of employable skills. The Board also found the 1983 murder was mitigated by the fact it resulted from significant stress in Burdan's life due to marital problems.
On June 29, 2005, Governor Schwarzenegger reversed the Board's second decision to grant parole. After first noting the various factors in favor of granting parole, as highlighted by the Board, the Governor concluded the gravity of the 1983 murder alone is enough to support a conclusion that Burdan's release on parole would pose an unreasonable risk to public safety.
Burdan filed a petition for writ of habeas corpus in the superior court, challenging the Governor's 2005 parole decision. The superior court denied the petition on August 7, 2006.
On June 29, 2007, Burdan filed the instant petition. On August 16, 2007, we issued an order to show cause to the Warden.

Discussion

I

Introduction
Penal Code section 3041 addresses how the Board makes parole decisions for indeterminate *588 life inmates. (Undesignated section references that follow are to the Penal Code.) Under subdivision (a), one year before the prisoner's minimum eligible parole date, a Board panel is to meet with the inmate, "shall normally set a parole release date," and shall do so "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." (§ 3041, subd. (a).) This release date must "comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." (Ibid.) However, subdivision (b) specifies the circumstances under which a parole release date need not be fixed. It provides that a parole release date shall be set "unless [the Board] determines" the inmate is presently unsuitable for parole, i.e., that "the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (§ 3041, subd. (b).)
Under Board regulations, the panel must determine whether the life prisoner is suitable for release on parole, and "[r]egardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (Cal.Code Regs., tit. 15, § 2402, subd. (a).) A parole date set under these regulations "shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public." (Id., § 2401.)
The regulations list six factors tending to show unsuitability for release on parole: (1) commission of the offense in an especially heinous, atrocious or cruel manner; (2) a previous history of violence; (3) an unstable social history; (4) prior sadistic sexual offenses; (5) a lengthy history of mental problems; and (6) serious misconduct in prison or jail. (Cal.Code Regs., tit. 15, § 2402, subd. (c).) They also list nine factors tending to show suitability for parole: (1) the absence of a juvenile record; (2) a history of reasonably stable social relationships; (3) tangible signs of remorse; (4) the commission of the crime resulted from significant stress, especially if the stress had built over a long period of time; (5) battered woman syndrome; (6) lack of a history of violent crime; (7) increased age, which reduces the probability of recidivism; (8) marketable skills and a reasonable plan for the future; and (9) responsible institutional behavior. (Id., § 2402, subd. (d).)
The importance of these factors is left to the discretion of the parole panel (Cal.Code Regs., tit. 15, § 2402, subds. (c), (d)), and judicial review of the Board's parole decisions is limited. (In re Rosenkrantz (2002) 29 Cal.4th 616, 655, 128 Cal. Rptr.2d 104, 59 P.3d 174.) "[T]he court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation." (Id. at p. 658, 128 Cal.Rptr.2d 104, 59 P.3d 174, italics added.) "Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the [Board].... [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [Board], but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is *589 irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the [Board's] decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the [Board's] decision." (Id at p. 677, 128 Cal.Rptr.2d 104, 59 P.3d 174.)
Any parole decision by the Board is subject to review by the Governor. Article V, section 8, subdivision (b), of the California Constitution provides: "No decision of the parole authority of this State with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the decision subject to procedures provided by statute. The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider. The Governor shall report to the Legislature each parole decision affirmed, modified, or reversed, stating the pertinent facts and reasons for the action."
The statutory procedures governing the Governor's review of a parole decision are set forth in section 3041.2. It states:
"(a) During the 30 days following the granting, denial, revocation, or suspension by a parole authority of the parole of a person sentenced to an indeterminate prison term based upon a conviction of murder, the Governor, when reviewing the authority's decision pursuant to subdivision (b) of Section 8 of Article V of the Constitution, shall review materials provided by the parole authority.
"(b) If the Governor decides to reverse or modify a parole decision of a parole authority pursuant to subdivision (b) of Section 8 of Article V of the Constitution, he or she shall send a written statement to the inmate specifying the reasons for his or her decision."
The Governor's determination of the inmate's suitability for parole is subject to the same standards as that of the Board. (In re Dannenberg (2005) 34 Cal.4th 1061, 1086, 23 Cal.Rptr.3d 417, 104 P.3d 783.) It is also subject to review under the same deferential "some evidence" standard. (In re Rosenkrantz, supra, 29 Cal.4th at p. 667, 128 Cal.Rptr.2d 104, 59 P.3d 174.)
Burdan attacks the Governor's decision to reverse the Board's grant of parole on a number of fronts. He contends the Governor's decision is not supported by some evidence that his release would pose an unreasonable risk of danger to society. He also contends the Governor's review of the Board's decision violated the terms of his plea agreement because, at the time of the plea, the Governor did not have authority to review parole decisions and he was assured any parole decision would be made by the Board alone. Finally, Burdan contends the Governor's reversal of the Board's grant of parole violates ex post facto principles of the United States Constitution. As we shall explain, because we agree with Burdan's first contention, we need not consider the others.

II

Administrative Record
Burdan has filed a motion for an order requiring the Warden to file a copy of the administrative record reviewed by the Governor in making his parole decision. As justification for the motion, Burdan has *590 expressed a concern that the Governor did not consider the full administrative record that was before the Board at the time it granted parole.
We deny Burdan's motion. The Governor has indicated he considered the same factors as the Board, and his decision reflects knowledge of the same matters that were before the Board. The Governor is required to consider the same record as the Board, and we presume official duty has been regularly performed. (Evid.Code, § 664.) We find the record before us adequate to resolve the issues presented.

III

Timeliness
The Warden contends the petition should be denied as untimely. The Warden points out that the Governor reversed the Board's parole decision on June 29, 2005, but Burdan did not file his habeas petition in the superior court until a year later, on June 28, 2006. The Warden further points out that the superior court denied Burdan's petition on August 7, 2006, yet he did not file the instant petition until June 29, 2007, more than 10 months later and two years after the Governor's parole decision.
The Warden relies on a number of cases indicating that, absent a showing of good cause, a petition for writ of habeas corpus must be filed without substantial delay. (See In re Sanders (1999) 21 Cal.4th 697, 703-705, 87 Cal.Rptr.2d 899, 981 P.2d 1038; In re Gallego (1998) 18 Cal.4th 825, 831, 77 Cal.Rptr.2d 132, 959 P.2d 290; In re Clark (1993) 5 Cal.4th 750, 765, 21 Cal. Rptr.2d 509, 855 P.2d 729.) However, these are all capital cases where the petition was a collateral attack on the underlying conviction. In Sanders, the high court explained the rationale for requiring a prompt petition: "By requiring that such challenges be made reasonably promptly, we vindicate society's interest in the finality of its criminal judgments, as well as the public's interest `in the orderly and reasonably prompt implementation of its laws.' [Citation.] Such timeliness rules serve other salutary interests as well. Requiring a prisoner to file his or her challenge promptly helps ensure that possibly vital evidence will not be lost through the passage of time or the fading of memories. In addition, we cannot overestimate the value of the psychological repose that may come for the victim, or the surviving family and friends of the victim, generated by the knowledge the ordeal is finally over." (In re Sanders, supra, at p. 703, 87 Cal. Rptr.2d 899, 981 P.2d 1038.)
These same considerations do not apply where a life prisoner challenges a parole decision. The record before the Board or Governor is all on paper, so there is little risk of vital evidence being lost. Finality of the conviction, both as to society in general and the victims in particular, is not an issue. The only one potentially prejudiced by a delay in challenging a parole decision is the inmate himself. It is, after all, the inmate who must remain in prison after he or she might otherwise have been released on parole. Any delay in filing a petition challenging the denial of parole means a corresponding delay in the ultimate release date. (See In re Bartlett (1971) 15 Cal.App.3d 176, 186, 93 Cal.Rptr. 96.) Because this is not a situation where a grant of habeas relief would require a retrial of the criminal charges, there is no potential prejudice to the state.
At any rate, in In re Clark, supra, 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729, the high court indicated a petition for writ of habeas corpus should be filed "as promptly as the circumstances allow." (Id, at p. 765, fn. 5,21 Cal.Rptr.2d 509, 855 *591 P.2d 729.) Here, despite Burdan's assertion that counsel appointed for him in his federal court challenge to the Governor's 2003 parole reversal told Burdan that he would handle any challenge to the Governor's 2005 parole reversal, Burdan was unrepresented in this matter until we appointed counsel for him. We do not find a delay of 10 months for an unrepresented prison inmate to file a petition for writ of habeas corpus in the Court of Appeal, after denial of a similar petition in the superior court, to be unreasonable. We shall therefore turn to the merits of Burdan's petition.

IV

Sufficiency of the Evidence
As explained earlier, the Board found Burdan suitable for parole. The Board explained that Burdan had no prior criminal record, has had reasonably stable relationships with others, has enhanced his ability to function within the law through various programs and educational opportunities while in prison, has participated in a variety of self-help and therapy programs, and has had no major infractions while in prison. The Board also noted Burdan has a number of employable skills that were enhanced while in prison. Regarding the 1983 murder, the Board indicated Burdan "committed the crime ... as a result of a significant stress in [his] life in that [he] and [his] wife had been having significant marital problems and in which [he] subsequently learned that she was having a lesbian affair with another woman."
The Board also noted Burdan has realistic parole plans, including a job offer and family support. The Board expressed its opinion, and that of a number of psychiatric evaluations, that Burdan shows appropriate remorse, understands the nature and magnitude of the offense, and accepts responsibility for his actions. The Board took note of Burdan's latest psychological evaluation, which states: "`Overall evaluating the three categories of risk for this inmate, history of problems, self-help and change, and realistic plans and support network, he is considered a low risk when it comes to potential future acts of violence. This conclusion is based on the extremely viewed actuarial risk factors present in this inmate's file, his lack of prior criminal record, lack of substance abuse, and overall productive life prior to his offense, stands out from most of the inmates within the Department of Corrections. The offense itself appears to have been a long, entangled, emotional event the likes of which are not likely to ever be duplicated again especially after all the positive gains this inmate has made.'"
In reversing the Board's decision, the Governor noted the factors supporting parole but nevertheless concluded the gravity of the 1983 murder alone supported denial. The Governor explained: "[T]he existence of significant stress does not mitigate the severity of his crime enough for me to conclude that the murder he committed was not especially grave. It was, even if his claim is true about the first shot being unintentional. Mr. Burdan shot his wife numerous times at close range, striking her a total of five times in the head, neck and torso. The autopsy, as described in the probation officer's report, indicated that the gun was probably only a couple of inches away from Mrs. Burden for one of the neck wounds and that a slug was recovered from her skull. According to the same report, the off-duty police officer heard at least five shots and stated that while the first three shots were in rapid succession, the last two shots occurred after he had gone into and returned from his house and were spaced `four or five seconds apart roughly.' Moreover, the same officer reported that the firing mechanism *592 of the gun required that the user physically cock the hammer before pulling the trigger, and that when he told Mr. Burdan he was going to check Mrs. Burdan's condition just after the shootings, Mr. Burden stated something to the effect of, `Don't bother. She's dead.' Mr. Burdan chose to repeatedly cock and fire the gun at his wife. ` As he told the 2005 Board, at some point after the initial gunshot, Mr. Burdan 'knew what [he] was doing' and `didn't want her to suffer.' Under these circumstances, the second-degree murder of which Mr. Burdan was convicted was especially grave because, although not his initial plan, he decided at some point to kill his wife and then did so intentionally and deliberately by shooting her multiple times at close range. This factor alone is enough for me to at this time conclude that his release from prison would pose an unreasonable public-safety risk."
Reduced to its essence, the Governor's explanation amounts to this: The murder was especially grave because Burdan decided at some point during the struggle to kill his wife and did so by deliberately shooting her multiple times at close range.
There is no question the record supports the factors cited by the Governor. However, the relevant test is not whether some evidence supports the reasons cited for denying parole, "but whether some evidence indicates a parolee's release unreasonably endangers public safety." (In re Lee (2006) 143 Cal.App.4th 1400, 1408, 49 Cal.Rptr.3d 931, italics omitted; see also, In re Tripp (2007) 150 Cal.App.4th 306, 313, 58 Cal.Rptr.3d 64.)
As explained earlier, one of the factors suggesting unsuitability for parole is that the murder was committed "in an especially heinous, atrocious or cruel manner." (Cal.Code Regs., tit. 15, § 2402, subd. (c)(1).) This factor alone may support a parole denial. (In re Dannenberg, supra, 34 Cal.4th at p. 1094, 23 Cal. Rptr.3d 417, 104 P.3d 783.) The factors to be considered in assessing the gravity of the commitment offense include: "(A) Multiple victims were attacked, injured or killed in the same or separate incidents. [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder, [¶] (C) The victim was abused, defiled or mutilated during or after the offense. [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. [¶] (E) The motive for the crime is inexplicable or very trivial in relation to the offense." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).)
The Warden contends one of the foregoing factors applies here, because the murder "was carried out in a dispassionate and calculated manner." According to the Warden, Burdan purchased ammunition, borrowed a handgun under false pretenses, arranged to meet his wife, and shot her five times at close range while being required to cock the gun before each shot.
It is hard to see how the 1983 murder of Mrs. Burden can possibly be characterized as one that was done in a "dispassionate and calculated manner, such as an execution-style murder." (Cal.Code Regs., tit. 15, § 2402, subd. (c)(1)(B).) The very essence of the offense was one of passion. And far from being calculated, even the Governor accepted that Burdan may not have intended to kill his wife initially. The murder took place in a residential area next door to the home of a police officer. Officer Hall described Burdan as emotionally upset, shaking, nervous and distraught after the shooting. As for the other factors relevant to the gravity of the offense, there were no multiple victims, Mrs. Burdan was not abused, defiled or mutilated, the murder was not carried out in a manner *593 demonstrating an exceptionally callous disregard for human suffering, and Burdan's motives were not inexplicable or very trivial.
At any rate, the California Supreme Court has held that, where the nature of the commitment offense is used as a basis for denying parole, the requirement that the offense be particularly egregious is meant to convey "only that the violence or viciousness of the inmate's crime must be more than minimally necessary to convict him of the offense for which he is confined." (In re Dannenberg, supra, 34 Cal.4th at p. 1095, 23 Cal. Rptr.3d 417, 104 P.3d 783.) As explained by the court: "In some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violationfor example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense. Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set `in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public....' ( ... § 3041, subd. (a).) `The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is `normally' to be granted. Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by ... section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (... § 190 et seq.)" (In re Rosenkrantz, supra, 29 Cal.4th at p. 683, 128 Cal.Rptr.2d 104, 59 P.3d 174.)
The Warden contends the facts and circumstances surrounding the 1983 murder of Mrs. Burdan were more than the minimal necessary to convict him of second degree murder, "given the elements of premeditation highlighted by the Governor." In his decision reversing the Board, the Governor mentioned the following aspects of the crime: "On the day of the murder, Mr. Burdan purchased ammunition and borrowed a gun from a friend, claiming it was for target practice. He then made arrangements to meet his wife to talk later that evening."
The fact that Burdan entered a negotiated plea of guilty to second degree murder does not preclude the Governor from considering particular aspects of the crime beyond its basic elements. (See In re Rosenkrantz, supra, 29 Cal.4th at pp. 678-679, 128 Cal.Rptr.2d 104, 59 P.3d 174 [holding that a jury verdict acquitting the defendant of first degree murder did not preclude the Governor from considering evidence of premeditation in assessing parole eligibility].) Thus, while second degree murder does not involve premeditation, the Governor may consider facts suggesting Burdan planned and prepared for the murder.
However, as noted earlier, the Governor did not rely on evidence of premeditation in concluding the gravity of the offense warranted denial of parole. Rather, the Governor stated: "[T]he second-degree murder of which Mr. Burdan was convicted is especially grave because, although not his initial plan, he decided at some point to kill his wife and then did so intentionally and deliberately by shooting her multiple times at close range." In other words, the Governor assumed Burdan did not initially plan to kill his wife, which would negate any suggestion of premeditation. *594 Burden may well have obtained a gun and ammunition in advance, but this may have been for the purpose of killing himself.
Given the deferential standard of review applied to the Governor's parole decisions, it is "inappropriate for courts to salvage the [Governor]'s inadequate findings by inferring factors that might have been relied upon. At minimum, the [Governor] is responsible for articulating the grounds for [his] findings and for citing to evidence supporting these grounds." (In re Roderick (2007) 154 Cal.App.4th 242, 265, 65 Cal.Rptr.3d 16.) "We must confine our review to the stated factors found by the [Governor], and all the evidence presented at the parole hearing which is relevant to those findings, not to findings that ... the [Governor] might have made." (In re DeLuna (2005) 126 Cal.App.4th 585, 593-594, 24 Cal.Rptr.3d 643.)
As explained above, the Governor's justification for finding the 1983 murder was particularly egregious is that Burdan decided at some point during the encounter to kill his wife and did so by deliberately shooting her multiple times at close range. However, the fact that Burdan intentionally killed his wife is not a permissible factor, inasmuch as malice is one of the minimal elements of second" degree murder (see §§ 187-189) and malice involves either an intent to kill or an intent to commit an act, the natural consequences of which are dangerous to human life. (See People v. Gortez (1998) 18 Cal.4th 1223, 1229, 77 Cal.Rptr.2d 733, 960 P.2d 537; People v. Saille (1991) 54 Cal.3d 1103, 1114-1115, 2 Cal.Rptr.2d 364, 820 P.2d 588.)
Thus, the Governor's justification for denying parole, in the face of overwhelming factors supporting it, is reduced to the fact that he shot his wife multiple times at close range. In assessing the adequacy of this rationale, it must be remembered the overarching consideration in a decision whether to grant parole is public safety. (In re Dannenberg, supra, 34 Cal.4th at p. 1084, 23 Cal.Rptr.3d 417, 104 P.3d 783; In re Scott (2005) 133 Cal. App.4th 573, 591, 34 Cal.Rptr.3d 905.) "Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." (In re Lee, supra, 143 Cal.App.4th at p. 1409, 49 Cal.Rptr.3d 931.) "For example, a seriously troubled adolescence, even for an 80-year-old inmate, might constitute `some evidence' of `a history of unstable or tumultuous relationships with others.' (Cal. Code Regs., tit. 15, § 2402, subd. (c)(3).) It would not necessarily be some evidence of an unreasonable danger to public safety." (In re Lee, supra, 143 Cal.App.4th at p. 1408, fn. 4, 49 Cal.Rptr.3d 931.)
"`[A]ll second degree murders by definition involve some callousness-i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and sufferings of others.'" (In re Scott (2004) 119 Cal.App.4th 871, 891, 15 Cal. Rptr.3d 32.) The fact that Burdan shot his wife multiple times at close range following a struggle in her car over the gun does not demonstrate the crime was particularly egregious, atrocious or heinous such that Burden remains a danger to the public nearly a quarter of a century later. As noted above, he did not attack, injure or kill multiple victims; did not carry out the offense in a dispassionate and calculated manner, such as an execution-style murder, or in a manner which demonstrates an exceptionally callous disregard for human suffering; and the motive for the crime was not inexplicable or very trivial. (Cal.Code Regs., tit. 15, § 2402, subd. (c)(1).) The fact that Burdan shot *595 his wife several times may suggest nothing more than that he intended to kill her, given that, even after the five shots, she remained alive for some period of time. (See In re Elkins (2006) 144 Cal.App.4th 475, 496-497, 50 Cal.Rptr.3d 503 ["On the facts of this case, with the victim continuing to move after a first blow, Elkins had to strike his victim multiple times in order to kill him"].) And the close range of the shots appears to be more a function of the confined quarters of the car than a particular callousness.
"The measure of atrociousness is not general notions of common decency or social norms, for by that yardstick all murders are atrocious. [Citation.] Rather, the inquiry is whether among murders the one committed by [Burdan] was particularly heinous, atrocious or cruel. [Citations.]" (In re Lee, supra, 143 Cal.App.4th at p. 1410, 49 Cal.Rptr.3d 931.)
In assessing the gravity of a particular crime, it must be kept in mind that "[t]he commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his `Previous Record of Violence'). Reliance on such an immutable factor `without regard to or consideration of subsequent circumstances' may be unfair [citation], and `runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.' [Citation.] The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time. [Citation.] Thus, denial of release based solely on the basis of the gravity of the commitment offense warrants especially close scrutiny." (In re Scott, supra, 133 Cal.App.4th at pp. 594-595, 34 Cal.Rptr.3d 905, fns. omitted; accord In re Elkins, supra, 144 Cal. App.4th at p. 496, 50 Cal.Rptr.3d 503.)
Here, even under the deferential "some evidence" standard, the justification given by the Governor for denying parole cannot withstand scrutiny. The Governor cited no evidence to suggest that, in the face of overwhelming evidence of his suitability for parole, Burdan's release would pose an unreasonable risk of danger to society.

Disposition
The petition for writ of habeas corpus is granted. The Governor's decision reversing the Board's grant of parole is vacated and the Board's decision is reinstated.
We concur: BLEASE, Acting P.J., and ROBIE, J.