[No. C063460. Third Dist. Aug. 17, 2010.]

In re ALICIA TAPLETT on Habeas Corpus.

## COUNSEL

Law Offices of William L. Schmidt and William L. Schmidt for Petitioner Alicia Taplett.

Edmund G. Brown, Jr., Attorney General, Julie L. Garland, Assistant Attorney General, Jennifer A. Neill and Yun Hwa Harper, Deputy Attorneys General, for Respondent State of California.

## OPINION

**HULL, J.**—On the evening of January 25, 1991, 20-year-old Alicia Taplett participated in a driveby shooting that claimed the life of 24-year-old Dorothy Expose. Taplett pleaded no contest to second degree murder with a weapon-use enhancement and, on May 1, 1992, was sentenced to state prison for an indeterminate term of 16 years to life. On November 12, 2008, the Board of Parole Hearings (Board) found Taplett suitable for parole. However, the Governor reversed the Board's decision, concluding Taplett's release would pose an unreasonable risk of danger to society.

Taplett filed a petition for writ of habeas corpus in the superior court, which was denied on July 27, 2009. She then filed a petition for writ of habeas corpus in this court. We issued an order to show cause to Mary Lattimore, Warden of the Central California Women's Facility, in order to review the Governor's decision. The warden filed a return to our order to show cause.

We conclude the evidence presented at the Board's parole suitability hearing supports the Governor's decision to reverse the Board's grant of parole and therefore deny the petition for writ of habeas corpus.

### FACTS AND PROCEEDINGS

The following description of the commitment offense is taken from the November 12, 2008, parole suitability hearing and the probation report prepared in connection with Taplett's 1992 conviction, which report was incorporated into the probation hearing.

Taplett and her friend Cynthia Feagin participated in a driveby shooting on the evening of January 25, 1991, that took the life of Dorothy Expose, a 24-year-old mother of four. Taplett was 20 years old at the time.

Prior to the shooting, Feagin had been involved in an ongoing feud with Expose over a mutual boyfriend. Taplett too had a grudge with Expose stemming from an incident approximately one month earlier, when Expose fired a gun into a vehicle occupied by Taplett and her two children.

On the evening of the shooting, Taplett was driving a car in which Feagin was the front seat passenger and two others, including Taplett's sister, were in the back. There was a handgun in the car. The four came upon Expose and several other people who had stopped at a liquor store. Taplett parked at a gas station nearby and she and Feagin got out. One of them advised the other to get the gun and said they were going to "handle" Expose. Feagin also said she was "fixing to bust a cap on this bitch."

Before Taplett and Feagin could confront Expose and the others in her group, Expose and the others drove away from the liquor store. Taplett and Feagin returned to their car. Taplett followed Expose to a stop sign, where Feagin took a shot at Expose's vehicle. Expose and the others fled.

After driving a short distance, Expose pulled to the side of the road and got out to inspect her vehicle for damages. While Expose and the others were standing outside their vehicle, Taplett drove up and Feagin shot at them at least three more times, hitting Expose in the back twice. Expose died as a result of these wounds.

Taplett entered a negotiated plea of no contest to second degree murder and was sentenced to an indeterminate term of 16 years to life. Her first parole eligibility date was November 29, 2001.

On November 20, 2007, the Board found Taplett unsuitable for parole. She filed a petition for writ of habeas corpus in the superior court. On February 4, 2009, the court granted the requested relief. However, while the court ordered that parole be granted, it further explained such grant remains subject to review by the Governor.

In the meantime, the Board conducted a new parole consideration hearing and, on November 12, 2008, found Taplett suitable for parole. At the hearing, evidence was presented that, during her incarceration, Taplett earned 21 units toward an AA (associate of arts) degree, received exceptional ratings from work supervisors, was disciplined only once, committed two minor prison infractions, and participated in numerous self-help programs. Taplett had no prior criminal record, although she admitted having dealt drugs for a few months as a teenager. There was also evidence that Taplett had two job offers waiting for her if she were released from prison, maintained family relationships while incarcerated, and had a place to live if released.

In July 2008, Dr. Stephen Pointkowski conducted a psychological evaluation of Taplett. Dr. Pointkowski opined that Taplett's risk of violent recidivism if released is in the low range and "her overall degree of insight concerning underlying etiological factors was judged to be adequate."

At the parole hearing, Taplett acknowledged her responsibility for the victim's death. She explained: "I was behind the wheel of that car. And I didn't have to go by anybody's demands or nothing. Anything that was said to me in that car, I didn't have to turn around, I didn't have to do anything but go away from there. And I made a decision to support my friend and that's why I am totally responsible for Ms. Expose. I took my co-defendant to that location, so I have to take responsibility for myself and her as well. Had I not drove there, this wouldn't have happened." Later, Taplett explained she was angry when the shooting occurred because of the incident a month earlier when the victim shot at the car containing Taplett's children.

The Board granted parole based on the following factors: Taplett exhibited "genuine remorse"; she accepted her guilt; she did not get angry when questioning became aggressive; she made improvements in education and vocational training; she performed well in her work assignments; she had had no serious prison infractions during the past 15 years; she participated in many self-help programs; she has realistic plans for work after parole; she has maintained family relationships; and she has no other criminal history.

The Governor reversed the Board's decision, concluding Taplett's release would pose an unreasonable risk of danger to society. The Governor concluded two factors supported denial: (1) the gravity of the 1991 offense, and (2) Taplett's lack of insight into the circumstances surrounding the offense.

Taplett filed a petition for writ of habeas corpus in the superior court, which was denied on July 27, 2009. Despite having found the evidence insufficient to support the denial of parole in 2007, the court concluded the 2008 report of Dr. Pointkowski provided new evidence. That report contains the following description by Taplett of the underlying cause for the commitment offense: "Poor choices that I made, making a decision that led to violence. No intentions of violence. It happened that way. That was a friend that I didn't think she would harm anybody. In my heart of hearts, I didn't think she meant to kill her, only scare her. You just don't have reasons for stuff like this. No excuse for those actions. It can't be sugarcoated. She said she was going to mop the bitch. I thought it would be a fight. She stated, 'I'm going to bust a cap on her.' I didn't think she would do it."

The superior court concluded the foregoing attempt by Taplett to minimize her involvement in the commitment offense constitutes sufficient evidence to support the Governor's denial of parole.

Taplett then filed a petition for writ of habeas corpus in this court, and we issued an order to show cause in order to review the Governor's decision.

DISCUSSION

I

*Standard of Review*

Penal Code section 3041 addresses how the Board makes parole decisions for indeterminate life inmates. (Undesignated section references that follow are to the Penal Code.) Subdivision (a) requires a Board panel to set a parole release date "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." (§ 3041, subd. (a).) However, under subdivision (b), the panel need not set a parole release date if it determines the inmate is presently unsuitable for parole because "the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual . . . ." (§ 3041, subd. (b).)

Under applicable regulations, "a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (Cal. Code Regs., tit. 15, § 2402, subd. (a).) The regulations list various factors tending

to show unsuitability for release on parole and other factors tending to show suitability. (*In re Burdan* (2008) 169 Cal.App.4th 18, 28 [86 Cal.Rptr.3d 549].) The importance of these factors is for the Board panel to decide (Cal. Code Regs., tit. 15, § 2402, subds. (c), (d)), and judicial review of such decision is strictly limited. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 655 [128 Cal.Rptr.2d 104, 59 P.3d 174].) " '[T]he court may inquire only whether *some evidence* in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation.' ([*In re Rosenkrantz, supra,* 29 Cal.4th] at p. 658, italics added.) 'Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the [Board].' " (*In re Burdan, supra,* 169 Cal.App.4th at p. 28.)

██ Any parole decision by the Board is subject to review by the Governor. Article V, section 8, subdivision (b) of the California Constitution reads: "No decision of the parole authority of this State with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the decision subject to procedures provided by statute. The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider. The Governor shall report to the Legislature each parole decision affirmed, modified, or reversed, stating the pertinent facts and reasons for the action."

Section 3041.2 sets forth the statutory procedures applicable to the Governor's review of a parole decision. It states:

"(a) During the 30 days following the granting, denial, revocation, or suspension by a parole authority of the parole of a person sentenced to an indeterminate prison term based upon a conviction of murder, the Governor, when reviewing the authority's decision pursuant to subdivision (b) of Section 8 of Article V of the Constitution, shall review materials provided by the parole authority.

"(b) If the Governor decides to reverse or modify a parole decision of a parole authority pursuant to subdivision (b) of Section 8 of Article V of the Constitution, he or she shall send a written statement to the inmate specifying the reasons for his or her decision."

"The Governor's determination of the inmate's suitability for parole is subject to the same standards as that of the Board. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1086 [23 Cal.Rptr.3d 417, 104 P.3d 783].) It is also subject to review under the same deferential 'some evidence' standard. (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 667.)" (*In re Burdan, supra,* 169 Cal.App.4th at p. 29.)

In two companion cases, *In re Lawrence* (2008) 44 Cal.4th 1181 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*) and *In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573] (*Shaputis*), the California Supreme Court clarified the standard for determining if "some evidence" supports a decision of the Board to deny parole. In particular, the court considered whether the proper focus should be on whether there is "some evidence" to support the rationale articulated by the Board, or whether there is "some evidence" of the core determination that the inmate remains a current threat to public safety, and concluded it is the latter. (*Shaputis, supra,* 44 Cal.4th at p. 1254.) "Where one or more factors are used to support a denial of parole, the relevant inquiry is whether those factors, when considered in light of the other factors in the record, are predictive of current dangerousness of the inmate. (*Shaputis, supra,* 44 Cal.4th at pp. 1254–1255.)" (*In re Burdan, supra,* 169 Cal.App.4th at p. 29.)

II

*Sufficiency of the Evidence*

In reversing the Board's decision to grant parole, the Governor noted the factors supporting parole, as articulated by the Board, but nevertheless concluded two factors support denial: (1) the gravity of the commitment offense, and (2) Taplett's lack of insight into the circumstances surrounding the offense.

As to the gravity of the offense, the Governor explained: "[T]he second-degree murder for which Ms. Taplett was convicted was especially heinous because it involved some level of premeditation and multiple victims. The record indicates that the crime partners approached the victim repeatedly, hunted her down armed with a gun, and attacked her repeatedly until she was dead. Ms. Taplett had many opportunities to avoid the life offense, but she continued to pursue Ms. Expose in furtherance of their plan."

Taplett contends the Governor failed to articulate a nexus between the commitment offense and current dangerousness, as required by *Lawrence* and *Shaputis*. However, this argument ignores the second part of the Governor's analysis. It is this second factor, lack of insight, that provides the required nexus.

After describing the serious nature of the commitment offense, the Governor continued: "I am also concerned that Ms. Taplett still lacks full insight into the circumstances surrounding the life offense, and that she attempts to minimize her responsibility for Ms. Expose's death. Ms. Taplett initially told the probation officer that she was aware of the ongoing feud between the victim and Ms. Feagin. Ms. Taplett also stated that her crime partner told her that she wanted to make 'peace' with the victim. However, Ms. Taplett acknowledged that 'she shot the gun herself into the air to let the victim know that the gun was in the car and that they were armed.' In 1995, Ms. Taplett 'maintained her innocence' by telling her mental-health evaluator that she was 'simply in the wrong place at the wrong time.' Then, in 2001, Ms. Taplett told her mental-health evaluator that her crime partner 'just started shooting' and that she 'had no idea she would do this.' She further claimed that she 'wasn't aware that [she] was providing transportation for taking a life.' Ms. Taplett told her 2008 mental-health evaluator that while her crime partner said that she was going to 'bust a cap on her,' Ms. Taplett nonetheless 'didn't think she would harm anybody.' This lack of understanding is of great concern, because it means that Ms. Taplett does not yet have the ability to understand the circumstances of her crime so that she can avoid such circumstances in the future."

In effect, the Governor concluded Taplett's lack of insight into the circumstances surrounding the commitment offense demonstrates a potential for future criminality.

Taplett contends there is not "some evidence" to support the Governor's conclusion that she lacks insight into the commitment offense, inasmuch as "every mental health professional and counselor who has examined or worked with [Taplett] since 1993 has concluded otherwise." She argues the Governor's refusal to accept the unanimous conclusions of such trained professionals amounts to arbitrary and capricious action, warranting reversal. Taplett cites as support *In re Gaul* (2009) 170 Cal.App.4th 20 [87 Cal.Rptr.3d 736] (*Gaul*), *In re Roderick* (2007) 154 Cal.App.4th 242 [65 Cal.Rptr.3d 16] (*Roderick*), *In re Barker* (2007) 151 Cal.App.4th 346 [59 Cal.Rptr.3d 746] (*Barker*), and *In re Ramirez* (2001) 94 Cal.App.4th 549 [114 Cal.Rptr.2d 381] (*Ramirez*), disapproved on other grounds in *In re Dannenberg, supra*, 34 Cal.4th at page 1100.

In *Gaul*, the Board denied parole based in part on a 1997 evaluation that indicated the inmate took responsibility for his behavior but tended to blame others involved in the offense and demonstrated little empathy for his victim. However, the Board failed to discuss two more recent evaluations finding the inmate suitable for release. (*Gaul, supra*, 170 Cal.App.4th at pp. 28, 30.) The Court of Appeal concluded that, in light of the more recent positive

assessments, the finding that the inmate was not suitable for parole lacked evidentiary support. (*Id.* at p. 39.)

In *Roderick*, the court concluded there was no evidence to support the Board's 2005 finding that the inmate lacked insight into the impact of his criminal behavior or the commitment offense. (*Roderick, supra*, 154 Cal.App.4th at p. 270.) All psychological reports since 1999 concluded the inmate posed no more danger to the public than the average person. (*Id.* at p. 272.)

In *Barker*, the Board based its rejection of parole on two factors: the inmate's need for therapy to cope with stress, and the need for the inmate's recent gains to be maintained over a longer period of time. (*Barker, supra*, 151 Cal.App.4th at p. 366.) The court found the evidence lacking on both factors. (*Id.* at pp. 367–368.) As to the first, the court found that none of the recent psychological reports mentioned any need for therapy or difficulty in dealing with stress. (*Id.* at p. 366.) The court observed that the finding regarding the need for further therapy appeared to be nothing more than "a boilerplate finding that seems to make its way into every denial of parole, whatever the record—and despite repeated criticisms from the courts." (*Id.* at p. 367.)

Finally, in *Ramirez*, the court concluded the Board lacked some evidence to support its finding that the inmate required further therapy. The court explained: "The life prisoner evaluation report prepared for the 1999 hearing characterized Ramirez's participation in self-help and therapy programs as consistently outstanding. The clinical psychologist who prepared the psychosocial report for the hearing noted Ramirez's successful participation in numerous substance abuse programs and therapy groups, and concluded that 'his psychological issues are in prolonged remission.' The psychologist specifically advised the Board that there was no psychiatric ground for denying parole." (*Ramirez, supra*, 94 Cal.App.4th at p. 571.) The court in fact concluded "[t]he Board's readiness to make a finding so at odds with the record supports Ramirez's claim that his parole hearing was a sham." (*Ibid.*)

The foregoing cases are readily distinguishable from the present matter. Although Taplett's prior psychological evaluations indicated she posed a low risk of involvement in a violent offense if released, and her most recent psychological evaluation stated her "overall degree of insight concerning underlying etiological factors was judged to be adequate," the latter evaluation also contained the following description by Taplett of the factors underlying the commitment offense: "Poor choices that I made, making a decision that led to violence. No intentions of violence. It happened that way. That was a friend that I didn't think she would harm anybody. In my heart of hearts, I didn't think she meant to kill her, only scare her. You just don't have

reasons for stuff like this. No excuse for those actions. It can't be sugar-coated. She said she was going to mop this bitch. I thought it would be a fight. She stated, 'I'm going to bust a cap on her.' I didn't think she would do it."

Unlike the cases relied upon by Taplett, the foregoing rationalization provides some evidence that she still lacks insight into the circumstances of the commitment offense, notwithstanding any contrary, summary conclusions in the clinical evaluations. Despite having entered a plea to second degree murder, with the requisite element of an intentional killing, Taplett continues to deny she had any such intent. Her description of the circumstances leading to the murder also differ markedly from the facts of the offense as related by other witnesses. Taplett insists she thought Feagin intended only to fight the victim, despite the fact Taplett intentionally pursued the victim even after Feagin took a shot at the victim's vehicle.

As explained above, our inquiry is limited to whether there is *some evidence* in the record to support the decision to deny parole. (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 658.) Only a modicum of evidence is required, and the resolution of any conflicts in the evidence and the weight to be given the evidence are for the Board and the Governor to decide. (*In re Burdan, supra*, 169 Cal.App.4th at p. 28.) Here, there is some evidence to support the Governor's finding that Taplett lacks proper insight into the circumstances of the commitment offense.

In *In re Rozzo* (2009) 172 Cal.App.4th 40 [91 Cal.Rptr.3d 85], the court explained the inmate's lack of insight into the causes of the commitment offense, in particular the inmate's racial hatred, rendered the circumstances of that offense still probative of the inmate's current level of dangerousness. (*Id.* at pp. 61–63.) In *In re Smith* (2009) 171 Cal.App.4th 1631 [90 Cal.Rptr.3d 400], the court concluded "[t]he gravity of [the inmate's] commitment offense has continuing predictive value as to current dangerousness in view of her lack of insight into her behavior and refusal to accept responsibility for her personal participation in the beating of [the victim]." (*Id.* at p. 1639.)

 Likewise, here, Taplett's failure to accept the full extent of her responsibility for the murder of Expose renders the circumstances of that offense relevant to her current level of dangerousness. Consequently, there is some evidence to support the Governor's reversal of the Board's grant of parole.

### DISPOSITION

The petition for writ of habeas corpus is denied.

Nicholson, Acting P. J., and Robie, J., concurred.